1  CARLE, MACKIE, POWER & ROSS LLP
   JOHN B. DAWSON (SBN 242161)
2  *jdawson@cmprlaw.com*
   RICHARD C. O'HARE (SBN 167960)
3  *rohare@cmprlaw.com*
   100 B Street, Suite 400
4  Santa Rosa, California 95401
   Telephone:  (707) 526-4200
5  Facsimile:  (707) 526-4707

6  Attorneys for Plaintiff
   INTERNATIONAL FRUIT GENETICS, LLC
7

8                 UNITED STATES DISTRICT COURT

9              EASTERN DISTRICT OF CALIFORNIA

10  INTERNATIONAL FRUIT GENETICS, LLC,    CASE NO.  1:15-at-52

11            Plaintiff,                   **COMPLAINT FOR DAMAGES AND
                                           INJUNCTIVE RELIEF**
12          v.

13  R.B. SANDRINI, INC., R.B. SANDRINI
   FARMS, L.P. d/b/a/ RB SANDRINI FARMS,
14  and RICHARD B. SANDRINI,

15            Defendants.                  **DEMAND FOR JURY TRIAL**

16

17        Plaintiff International Fruit Genetics, LLC, a California limited liability company

18  ("Plaintiff" or "IFG"), by its attorneys, as and for its Complaint against Defendants R.B.

19  Sandrini, Inc., R.B. Sandrini Farms, L.P. doing business as "RB Sandrini Farms," and Richard B.

20  Sandrini (collectively, "Defendants") alleges as follows:

21        1.    IFG develops and patents proprietary hybrid table grape varieties in the United

22  States and other countries around the world.  IFG and Defendants entered in a license agreement

23  pursuant to which Defendant was permitted to develop and farm a particular vineyard planted to

24  one of IFG's proprietary varieties: IFG's proprietary IFG Four grapevine ("IFG Four"), which is

25  the subject of IFG's issued U.S. Patent No. PP 24,439. IFG's license agreement restricts and

26  prohibits its licensees from propagating IFG's proprietary varieties and planting additional

27  vineyards without IFG's express permission. This action arises out Defendants' unauthorized

28  propagation of IFG Four in violation of IFG's patent rights and the parties' agreements.  On

1  information and belief, Defendants have planted additional vineyards of IFG Four without IFG's

2  permission in express violation of IFG's patent rights and the parties' agreement. Defendants

3  grow and sell grapes from these unauthorized vineyards.  Defendants also have refused to pay

4  royalties on the revenues from these grapes in express violation of the parties' agreement.

5  Accordingly, IFG brings this action for patent infringement, breach of contract, intentional

6  interference with prospective business relationships, unjust enrichment, intentional

7  misrepresentation, promissory estoppel, and violation of Cal. Bus & Prof. Code § 17200.

8                              **JURISDICTION AND VENUE**

9          2.       This Court has original subject matter jurisdiction over this action pursuant to 28

10  U.S.C. §§ 1331 and 1338.  This Court has related claim jurisdiction over the state law claims

11  pursuant to 28 U.S.C. § 1367.

12         3.       Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b), 1391(c),

13  and 1400(b) because Defendants reside in this judicial district, have regularly conducted business

14  in this judicial district, and/or have committed acts of infringement in this judicial district.

15                                **THE PARTIES**

16         4.       Plaintiff International Fruit Genetics, LLC is a California limited liability

17  company, with its principal place of business at 441 Vineland Road, Bakersfield, Kern County,

18  California, United States of America.

19         5.       On information and belief, Defendant R.B. Sandrini, Inc. is a California

20  corporation with its principal place of business at 10889 Casey Avenue, Delano, California

21  93215.  On information and belief, defendant R.B. Sandrini, Inc. is engaged in the business of

22  growing and selling table grapes.

23         6.       On information and belief, Defendant R.B. Sandrini Farms, L.P. doing business as

24  "RB Sandrini Farms," is a California limited partnership with its principal place of business at

25  10889 Casey Avenue, Delano, California 93215.  On information and belief, defendant R.B.

26  Sandrini Farms, L.P. is engaged in the business of growing and selling table grapes.

27         7.       On information and belief, Defendant Richard B. Sandrini ("Sandrini") is a

28  natural person residing in Bakersfield, Kern County, California.  On information and belief, he

is, and at all times relevant herein was, an officer, director, manager, principal, shareholder, partner, and/or beneficial owner of Defendants R.B. Sandrini, Inc. and R.B. Sandrini Farms, L.P.

## FACTUAL BACKGROUND

8.      IFG was founded in Bakersfield, California in 2001.  IFG invents, develops, grows, evaluates, and licenses hybrid table grape varieties in the United States and ten other countries around the world.

9.      Under the direction of Dr. David Cain, the general manager of IFG ("Dr. Cain"), IFG operates a grape-breeding program to invent and develop new varieties of table grapes that would be of particular interest to commercial growers.  IFG has spent millions of dollars in the last thirteen years on its breeding program.  This research has been successful, and IFG has bred and identified dozens of new varieties of table grapes of interest.  Attached hereto as <u>Exhibit A</u> is a schedule of IFG's proprietary table grape varieties as of December 31, 2014.

10.      The process behind IFG's business is as follows: after IFG develops a table grape variety of interest, IFG applies for a plant patent for such grapevine variety with the United States Patent and Trademark Office ("USPTO"), as well as for "plant breeders' rights" for such table grape variety in a number of countries.  The value in IFG's business lies in the intellectual property rights that IFG holds in respect of the proprietary plant varieties that it develops.  IFG's income is derived principally from these rights.  Consequently, it is of critical importance to IFG that these rights are closely guarded, controlled, and monitored.

11.      Thereafter, IFG enters into license agreements with third parties to permit them to grow, market, farm, and/or sell the table grapes from IFG's proprietary table grape varieties, subject to the terms and conditions of the license agreements.  Currently, IFG has dozens of table grape varieties being grown by hundreds of growers around the world, pursuant to hundreds of such license agreements.

12.      As a result of the efforts described in paragraph 9 hereof, IFG developed the IFG Four table grape variety.  On June 22, 2011, Dr. Cain (as inventor) applied to the USPTO for a plant patent for the IFG Four grapevine variety.

//

13.     On May 13, 2014, U.S. Patent No. PP 24,439, entitled "Grapevine 'IFG Four'" (the "'439 Patent"), was duly and legally issued to IFG, the owner by assignment of the '439 Patent.  The '439 Patent describes and claims the variety of grapevine denominated IFG Four. The IFG Four grapevine is characterized by its dark red uniform berries of large size with high sugar content born on medium to large size clusters.  A true and correct copy of the '439 Patent is attached hereto as Exhibit B.

14.     IFG licenses proprietary plant material, including, but not limited to, the IFG Four, to growers pursuant to a license agreement that requires them to refrain from propagating the vines themselves or distributing the vines to third parties.  The uncontrolled proliferation of the IFG Four plant material (or other IFG proprietary varieties) could have a devastating impact on IFG if growers are able to obtain and/or propagate the plant material without authorization and unfairly use the results of IFG's efforts.

**IFG's Provision of A-2640 Plant Material to Defendants**

15.     On or around March 1, 2006, Defendants and IFG entered into a Proprietary Cultivar Planting Rights License Agreement (the "2006 License Agreement") whereby Defendants would plant 20 acres of IFG A-2640, also known as "ARKANSAS BLACK," up to a maximum of 10,380 plants.  A true and correct copy of the 2006 License Agreement is attached hereto as Exhibit C.  The maximum number of plants was set forth in Schedule 4.1 of the 2006 License Agreement.

16.     Section 7.1 of the 2006 License Agreement required Defendants to pay IFG royalties on all sales of "Fruit."  "Fruit" is defined in Exhibit A of the 2006 License Agreement as "any and all fruit grown from time to time from the Plants, regardless of the quality or composition thereof."  "Plants" are defined in Exhibit A of the 2006 License Agreement as "the plants produced from IFG Proprietary Cultivars (including plants growing on their own roots, and plants produced by grafting Graftwood on rootstocks)."

17.     Pursuant to the 2006 License Agreement, IFG provided Defendants with approximately 10,380 plants of IFG A-2640.

//

**IFG's Provision of IFG Four Plant Material to Defendants**

18.     On or around March 23, 2009, Sandrini sent IFG an email regarding Defendants' dissatisfaction with the grapes from the IFG A-2640 plants.

19.     In or around February 2009, as an accommodation to Defendant, IFG provided Defendants with IFG Four budwood (the grapes of which were then known as "SWEET ROMANCE") for purposes of grafting over the original A-2640 vines with the understanding that the Defendants would enter into a new Proprietary Cultivar Planting Rights License Agreement with respect to the IFG Four plant material.  Thereafter, Defendants grafted over their A-2640 vines with the IFG Four budwood.  By grafting the A-2640 vines with the IFG Four budwood, these vines would produce the grapes of the IFG Four variety.  As a result of the grafting procedure, Defendants have grapevines which consist of the roots and vine trunk of the A-2640 variety and the upper canes and fruit of the IFG Four variety.

20.     In or around June 2009, IFG provided Defendants with a Settlement Agreement and Mutual Release between IFG and Defendants, dated as of June 1, 2009 (the "Settlement Agreement"), and a Proprietary Cultivar Planting Rights License Agreement dated as of June 1, 2009 (the "2009 License Agreement") memorializing the parties' agreement with respect to the provision of IFG Four plant material as a replacement for the A-2640 vines.  A true and correct copy of the Settlement Agreement is attached hereto as Exhibit D.  A true and correct copy of the 2009 License Agreement is attached hereto as Exhibit E.  Section 8.1 of the 2009 License Agreement required Defendants to pay royalties for all "Disposition of Fruit," including sales thereof.

21.     Upon information and belief, beginning as early as August of 2010, Defendants harvested and sold grapes produced from the IFG Four plant material that had been grafted onto the A-2640 vines under the name "NICOLO."

22.     On or around October 21, 2011, Tom Bracken, IFG's Chief Financial Officer, spoke with Defendant Sandrini regarding Defendants' obligation to pay royalties on the sales of the IFG Four/NICOLO grapes.  During this conversation, Defendant Sandrini claimed that he had never signed a contract for the IFG Four plant material, and therefore Defendants did not

1  owe any royalties on this variety.

2      23.   On or around November 16, 2011, IFG's attorneys sent Defendants a demand

3  letter informing them of their obligation to pay royalties under the 2006 License Agreement (the

4  "IFG Demand Letter").  A true and correct copy of the IFG Demand Letter is attached hereto as

5  Exhibit F. The IFG Demand Letter required Defendants to provide written confirmation by

6  December 15, 2011, of their intention to "comply with the terms of Section 7.1 of the original

7  License Agreement and pay royalties on the fruit from this vineyard."

8      24.   On or around December 9, 2011, Defendants sent IFG a letter and check no.

9  99381 drawn on the account of "R.B. Sandrini Farms," in the amount of $14,011.22.  The check

10  contained an accounting notation describing payment as "2011 ROYALTY FOR NICOLO."

11  The letter listed the "TOTAL 2011 CROP PRODUCTION FOR NICOLO" as "19959 BOXES,"

12  and contained a royalty calculation for the "TOTAL ROYALTY DUE" as $14,011.22.  True and

13  correct copies of the December 9, 2011 letter and check no. 99381 are attached hereto as

14  Exhibit G.

15      25.   On or around November 28, 2012, Defendants sent IFG a letter and check no.

16  005899 drawn on the account of "R.B. Sandrini Incorporated," in the amount of $15,398.81.

17  The check contained an accounting notation describing payment as "2012 ROYALTY –

18  NICOLO."  The letter listed the "TOTAL 2012 CROP PRODUCTION FOR NICOLO" as

19  "18,848 BOXES," and contained a royalty calculation for the "TOTAL ROYALTY DUE" as

20  $15,398.81.  True and correct copies of the November 28, 2012 letter and check no. 005899 are

21  attached hereto as Exhibit H.

22      26.   Defendants' conduct and course of dealing, including, but not limited to, the

23  payment of royalties in 2011 and 2012 on the IFG Four grapes, is consistent with the terms of the

24  2006 License Agreement and the terms of the Settlement Agreement and the 2009 License

25  Agreement.

26      27.   On or around December 16, 2013, Defendants sent IFG a letter and check no.

27  006080 drawn on the account of "R.B. Sandrini Incorporated," in the amount of $16,601.34.

28  The letter listed the "TOTAL 2013 CROP PRODUCTION FOR NICOLO" as "20,184 BOXES,"

1  and contained a royalty calculation for the "ROYALTY" as $16,601.34.  True and correct copies

2  of the December 16, 2013 letter and check no. 006080 are attached hereto as <u>Exhibit I</u>.

3      28.    The California Table Grape Commission ("CTGC") publishes an annual report

4  regarding the volume of California table grapes harvested, which is organized by the number of

5  boxes sold for each table grape variety.

6      29.    According to the 2013 CTGC report, 52,945 boxes of "NICOLO" (IFG Four)

7  grapes were harvested.  Defendants, however, only paid IFG a royalty on 20,184 boxes of the

8  "NICOLO" (IFG Four) variety from the 2013 harvest.

9      30.    After IFG reviewed the 2013 CTGC report, Bracken called Defendant Sandrini

10  regarding the apparent discrepancy.  During this conversation, Defendant Sandrini acknowledged

11  the discrepancy, and he admitted that Defendants had only paid royalties to IFG on the original

12  19-acre block for which he had a contract.  Sandrini informed Bracken that he had grafted over a

13  second block of IFG Four "NICOLO" grapes at a vineyard located on the corner of Garces

14  Highway and Benner Avenue, which produced additional IFG Four grapes in 2013.  According

15  to Defendant Sandrini, this second block of IFG Four grapes were not subject to Defendants'

16  agreements with IFG, and therefore Defendants were not obligated to pay royalties on the grapes

17  harvested from this additional block.

18      31.    Defendants have admitted to selling 53,945 boxes of fruit harvested from the

19  patented IFG Four vines in 2012 and 52,945 boxes of the IFG Four fruit in 2013.  On

20  information and belief, Defendants have grown and will continue to grow, and are offering for

21  sale and will continue to offer for sale, the fruit of the patented IFG Four vines.

22      32.    Despite their knowledge and admissions that propagating (via asexual

23  reproduction), using, offering for sale, and selling the patented IFG Four vines and their fruit are

24  unlicensed activities that infringe the terms of the 2006 License Agreement and the terms of the

25  Settlement Agreement and the 2009 License Agreement and IFG's patent rights under the '439

26  Patent, Defendants continue to conduct these activities.  Defendants have been willfully

27  infringing, are willfully infringing, and will continue to willfully infringe the terms of the 2006

28  License Agreement and the terms of the Settlement Agreement and the 2009 License Agreement

1  and IFG's patent rights under the '439 Patent.

2      33.    Defendants were never licensed to have the number of patented IFG Four vines in

3  their possession.  On information and belief, Defendants unlawfully and unfairly propagated, and

4  thereby wrongfully obtained, additional quantities of the grapevine plant known as IFG Four.

5  IFG believes discovery will show that Defendants knowingly propagated the IFG Four vines

6  unlawfully.

7      34.    The continued willful infringement by Defendants will, unless enjoined,

8  irreparably harm IFG.  If permitted to continue their willful infringement, Defendants will

9  continue to enjoy the unfair advantage they have obtained.

10     35.    At no time did IFG give written approval, authorization, or direction to

11 Defendants to propagate the second block of IFG Four plants that were found on Defendants'

12 property.

13     36.    Defendants' aforementioned actions have been deliberate, willful, malicious and

14 intentional.

**FIRST CLAIM FOR RELIEF**
<u>**Infringement**</u>
**(against all Defendants)**

17     37.    IFG repeats and re-alleges the allegations of paragraphs 1 through 36 above as if

18 fully set forth herein.

19     38.    In violation of 35 U.S.C. § 271, Defendants have infringed, continue to infringe,

20 and/or will infringe the '439 Patent by asexually propagating, using, offering for sale, and/or

21 selling the grapevine plant known as IFG Four and/or the fruit thereof beyond the scope of the

22 parties' license.  Each of the named Defendants is directly infringing the '439 Patent, or is

23 inducing or contributing to its infringement by others.

24     39.    IFG has been and will be damaged by Defendants' infringement.  Unless

25 Defendants, and each of them, are enjoined by this Court, their continuing willful infringement

26 will threaten the integrity of IFG's variety licensing program and irreparably harm the IFG.

27 //

28 //

**SECOND CLAIM FOR RELIEF**
<u>**Breach of Contract**</u>
**(against all Defendants)**

40.     IFG repeats and re-alleges each of the factual allegations contained in paragraphs 1 through 38 as if fully set forth herein.

41.     IFG performed all of its obligations under the 2006 License Agreement and the 2009 License Agreement in accordance with their terms, or alternatively, IFG's obligation to perform thereunder was discharged by Defendants' conduct.

42.     Defendants' failure to pay royalties on all IFG Four grapes as described above constitutes a breach of Section 7.1 of the 2006 License Agreement and Section 8.1 of the 2009 License Agreement.

43.     Defendants' unauthorized propagation of IFG proprietary plant material as described above constitutes a breach of the limited use sublicense granted in Section 2.1 of both the 2006 License Agreement and the 2009 License Agreement.

44.     Defendants' breaches set forth above were willful and deliberate, and as a proximate and foreseeable result thereof, IFG has incurred substantial damage in an amount to be determined at trial.  As a further direct and proximate cause of said breaches of these agreements, IFG has been compelled to retain legal counsel to file and prosecute this action.  The amount of IFG's total damages and attorneys' fees is presently unknown and is in an amount to be proven at trial.  Bothe the 2006 and 2009 License Agreements provide for the prevailing party to recover a reasonable sum for attorneys' fees and recovery of all costs incurred, and recovery of which are hereby sought.

**THIRD CLAIM FOR RELIEF**
<u>**Intentional Interference with Prospective Economic Relationships**</u>
**(against all Defendants)**

45.     IFG repeats and re-alleges the allegations of paragraphs 1 through 44 above as if fully set forth herein.

46.     By acquiring and propagating the grapevine plant known as IFG Four without authorization, Defendants intentionally interfered with prospective economic relationships between IFG and nurseries and/or other growers licensed (or who may be licensed in the future)

1   to propagate and sell the patented IFG Four vines, thereby depriving IFG of economic benefits in

2   the form of lost royalties.  Growers and/or nurseries will be less inclined to contract with IFG

3   and make the significant investments necessary if other growers are permitted to circumvent the

4   authorized process for obtaining the patented varieties of grapes.

5        47.    Upon information and belief, Defendants knew that they were in possession of

6   grapevine plants known as IFG Four that they had unlawfully and unfairly obtained and/or

7   propagated.

8        48.    Unless Defendants are enjoined by this Court, they will continue to interfere with

9   the economic relationships between IFG and nurseries and/or other growers licensed (or who

10  may be licensed in the future) to propagate and sell the IFG Four vines, and IFG will continue to

11  be irreparably harmed.

12                              **FOURTH CLAIM FOR RELIEF**
                                     <u>Unjust Enrichment</u>
13                                  **(against all Defendants)**

14       49.    IFG repeats and re-alleges the allegations of paragraphs 1 through 48 above as if

15  fully set forth herein.

16       50.    By propagating the IFG Four vines and selling grapes, all in an unlawful manner

17  and without authorization, Defendants have unjustly received significant benefits.  Defendants

18  have created unauthorized plant material; revenues from the sale of IFG Four grapes; and a

19  significant head start in growing the vines; learning how best to cultivate them, and establishing

20  relationships with retailers for the sale of IFG Four grapes.

21       51.    Defendants' unjust receipt and retention of such benefits has unjustly enriched

22  them at the expense of IFG and other California table grape growers.

23                              **FIFTH CLAIM FOR RELIEF**
                    <u>Violation of California Business and Professions Code §17200</u>
24                                  **(against all Defendants)**

25       52.    IFG repeats and re-alleges the allegations of paragraphs 1 through 51 above as if

26  fully set forth herein.

27       53.    With exceptions not applicable here, only IFG is authorized to make available the

28  IFG Four plant material claimed in the '439 Patent.  Since the patent issued, and at present, only

1    Defendants have obtained a license to acquire the vines in controlled quantities.

2        54.    In violation of California Business and Professions Code §17200, Defendants

3    have unlawfully and unfairly propagated, and thereby obtained additional quantities of, IFG Four

4    plant material.  Defendants have sold fruit from the resulting vines.  Defendants have continued

5    and will continue to unlawfully and unfairly propagate and grow the IFG Four plant material and

6    offer the fruit thereof for sale.

7        55.    The unlawful and unfair acts of Defendants have deprived IFG of the royalties to

8    which they are entitled on the grapes from IFG Four plants, subject of the '439 Patent, which are

9    and/or were within Defendants' possession and control.  More fundamentally, Defendants'

10   unlawful and unfair acts have undermined IFG's licensing program and its significant investment

11   in that program by, *inter alia,* obtaining a substantial advantage for a single grower in a manner

12   that is inconsistent with the program's goal by unilaterally propagating '439 Patent plant material

13   without any regard to the restrictions imposed by IFG.

14       56.    Unless Defendants are enjoined, they will continue their unlawful and unfair acts

15   and IFG will continue to be irreparably harmed.

16                          **SIXTH CLAIM FOR RELIEF**
17                          <u>**Intentional Misrepresentation**</u>
                            **(against all Defendants)**
18

19       57.    IFG repeats and re-alleges the allegations of paragraphs 1 through 56 above as if

20   fully set forth herein.

21       58.    On or about June 1, 2009, Defendant Sandrini represented to IFG representatives,

22   including Dr. Cain, IFG's general manager, that he would execute, on behalf of Defendant

23   Sandrini Farms, L.P., the Settlement Agreement (Exhibit D hereto) and the 2009 License

24   Agreement (Exhibit E hereto).

25       59.    On information and belief, the representations made by Defendant Sandrini as

26   described in the previous paragraph were false in that Defendant Sandrini had no intention of

27   executing said Settlement Agreement or 2009 Proprietary Cultivar Planting Rights License

28   Agreement.  On information and belief, Defendants, and each of them, knew that at the time that

1   Defendant Sandrini made such representations, the representations were false, and were made

2   with the intent to deceive IFG and to induce the IFG to deliver IFG Four plant material to

3   Defendants.

4         60.    IFG believed the representations of Defendant Sandrini to be true, and in reliance

5   on these representations, IFG was induced to deliver its proprietary IFG Four plant material to

6   the Defendants.  IFG has been damaged by its reliance on said representation as Defendants have

7   used Defendant Sandrini's failure to execute the Settlement Agreement and/or the Proprietary

8   Cultivar Agreement as a purported basis for withholding payments which are due to IFG from

9   the sale of fruit from IFG Four plant material.  IFG was further damaged by Defendants'

10  propagation of additional IFG Four vines not contemplated by the Settlement Agreement or

11  Proprietary Cultivar Agreement.  Such propagation undermines IFG's licensing program and

12  lessens the value of IFG's proprietary plant material to its licensed nurseries and other growers.

13
14  **SEVENTH CLAIM FOR RELIEF**
    **Promissory Estoppel**
    **(Against all Defendants)**
15

16        61.    IFG repeats and re-alleges the allegations of paragraphs 1 through 60 above as if

17  fully set forth herein.

18        62.    On or about June 1, 2009, Defendant Sandrini represented to IFG representatives,

19  including Dr. Cain, IFG's general manager, that he would execute the Settlement Agreement

20  (Exhibit D hereto) and the 2009 License Agreement (Exhibit E hereto).

21        63.    IFG believed the representations of Defendant Sandrini to be true, and in

22  reasonable reliance on these representations, IFG delivered its proprietary IFG Four plant

23  material to the Defendants.  IFG was damaged by its reliance on said representation as

24  Defendants have used Defendant Sandrini's failure to execute the Settlement Agreement and the

25  2009 License Agreement as a purported basis for withholding payments which are due to IFG

26  from the sale of fruit from IFG Four plant material.  IFG was further damaged by Defendants'

27  propagation of additional IFG Four vines not contemplated by the Settlement Agreement or 2009

28  License Agreement.  Such propagation undermines IFG's licensing program and lessens the

1  value of IFG's proprietary plant material to its licensed nurseries and other growers.

**EIGHTH CLAIM FOR RELIEF**
**Intentional Misrepresentation**
**(Against all Defendants)**

4       64.     IFG repeats and re-alleges the allegations of paragraphs 1 through 63 above as if

5  fully set forth herein.

6       65.     On or around November 28, 2012, Defendants, and each of them, represented to

7  IFG that they had a total production from IFG Four plant material in 2012 of 18,848 boxes.  On

8  or about December 16, 2013, Defendants, and each of them, represented to IFG that the total

9  2013 crop production from IFG Four plant material was 20,184 boxes.

10       66.     These representations were false in that the actual crop production from IFG Four

11  plant material was substantially higher than that represented by Defendants.  On information and

12  belief, the actual crop production for the year 2012 was at least 53,945 boxes, and the actual crop

13  production for 2013 was 52,945 boxes.  At the time the Defendants made the aforementioned

14  representations, they knew that the representations were false and made such representations

15  with the intent to deceive IFG and to induce IFG to accept royalties which were far less than

16  those which would be due had Defendants obtained a license to cultivate the plants necessary to

17  produce such crop quantities.  Furthermore, on information and belief, Defendants made such

18  representations to IFG so that IFG would not investigate Defendants' unlawful propagation of

19  the IFG Four plant material.

20       67.     IFG relied on such representations by accepting royalties in an amount far less

21  than what would otherwise be due for such crop quantities.  Furthermore, in reliance on the

22  representations, IFG did not institute an investigation into the origin of such crop quantities,

23  which investigation may have mitigated further damages caused by Defendants' undermining of

24  IFG's licensing program.

25  //

26  //

27  //

28  //

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff IFG requests that judgment be entered as follows:

1.      For a preliminary and permanent injunction enjoining Defendants, and their trustees, agents, servants, and employees, and all persons acting under, in concert with, or for Defendants from obtaining or using any Organic Material (as defined in the 2006 License Agreement and the 2009 License Agreement) and IFG Confidential Information (as defined in the 2006 License Agreement and the 2009 License Agreement) (including, without limitation, all trade secrets or trademarks, or labels, packages or material containing any trademarks);

2.      For an order requiring Defendants to deliver to IFG, or if so directed by IFG in writing, destroy under the supervision of IFG, all Organic Material (as defined in the 2006 License Agreement and the 2009 License Agreement) and IFG Confidential Information (as defined in the 2006 License Agreement and the 2009 License Agreement) (including, without limitation, all trade secrets or trademarks, or labels, packages or material containing any trademarks) in Defendants' possession or control, and/or cut off vines below the graft of any IFG Proprietary Cultivar (as defined in all of Defendants' agreements with IFG) in Defendants' possession or control;

3.      For an order directing Defendants to file with this Court, and serve on Plaintiff within fifteen (15) days (or such other reasonable period as the court may direct) after service of an injunction, a report in writing, under oath, setting forth in detail the manner and form in which Defendants have complied with any injunction or restraining order;

4.      As to those claims for which this element of relief is applicable, for compensatory damages in an amount to be determined at trial, plus interest at the legal rate;

5.      As to those claims to which this element of relief is applicable, for a trebling of damages pursuant to 35 U.S.C. § 284;

6.      As to those claims to which this element of relief if applicable, for exemplary or punitive damages;

7.      As to those claims for which this element of relief is applicable, for Plaintiff's reasonable attorneys' fees and court costs expended in this action;

Case No.                                        COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

8.       For costs of the suit incurred herein;

9.       For such other and further relief as the Court may deem just and proper; and

10.      For trial by jury of this action and its claims for relief.

Dated: January 20, 2015                CARLE, MACKIE, POWER & ROSS LLP


                                       By:   /s/ Richard C. O'Hare
                                             Richard C. O'Hare
                                             John B. Dawson
                                             100 B Street, Suite 400
                                             Santa Rosa, CA 95401
                                             Telephone: (707) 526-4200
                                             Facsimile: (707) 526-4707
                                             rohare@cmprlaw.com
                                             jdawson@cmprlaw.com

                                             Attorneys for Plaintiff
                                             International Fruit Genetics, LLC

CARLE, MACKIE,
POWER & ROSS LLP

Case No.                                     COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

**DEMAND FOR JURY TRIAL**

As set forth in its Complaint and prayer for relief, Plaintiff hereby requests a trial by jury in this matter.

Dated:  January 20, 2015                    CARLE, MACKIE, POWER & ROSS LLP


By:  /s/Richard C. O'Hare
                                            Richard C. O'Hare
                                            John B. Dawson
                                            100 B Street, Suite 400
                                            Santa Rosa, CA 95401
                                            Telephone: (707) 526-4200
                                            Facsimile: (707) 526-4707
                                            rohare@cmprlaw.com
                                            jdawson@cmprlaw.com

                                            Attorneys for Plaintiff
                                            International Fruit Genetics, LLC

Case No.                                    COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

CARLE, MACKIE,
POWER & ROSS LLP

# EXHIBIT A

| IFG VARIETIES LIST | | |
| As of June 25, 2014 | | |
| Selection number | Trademark Name | Cultivar Name USA |
| 01118-031-077 | Sweet Surrender | IFG 31-077 |
| 01117-104-253 | Sweet Sunshine | IFG 104-253 |
| 01032-068-175 | Sweet Celebration | IFG 68-175 |
| 01163-041-164 | Sweet Romance | IFG Four |
| 01073-093-242 | Sweet Jubilee | IFG Five |
| 04150-020-229 | Sweet Sapphire | IFG Six |
| 03097-048-221 | Cotton Candy | IFG Seven |
| 04003-040-052 | Sweet Enchantment | IFG Eight |
| 01032-067-219 | Jack's Salute | IFG Nine |
| 03039-067-105 | Sweet Globe | IFG Ten |
| 05178-093-166 | Sugar Crisp | IFG Eleven |
| 02117-075-130 | Funny Fingers | IFG Twelve |
| 01108-029-017 | No trademark name | IFG Thirteen |
| 04145-020-169 | Sweet Mayabelle | IFG Fourteen |
| 03030-069-157 | No trademark name | IFG Fifteen |
| 01161-040-245 | No trademark name | IFG Sixteen |
| 01161-040-244 | No trademark name | IFG Seventeen |
| 04151-020-244 | No trademark name | IFG Eighteen |
| 06053-106-228 | No trademark name | IFG Nineteen |
| 96096-095-039 | No trademark name | IFG Twenty |
| 06006-102-053 | No trademark name | IFG Twenty-one |
| 06089-096-177 | | |
| 107-029 | | |
| 031-044 | | |
| 075-227 | | |
| 07083-080-172 | | |
| 040-222 | | |
| 070-040 | | |
| 045-183 | | |
| 064-191 | | |
| 105-289 | | |
| 031-046 | | |
| 093-136 | | |

| Selection number | Trademark Name | Cultivar Name USA |
|---|---|---|
| 069-159 | | |
| 047-119 | | |
| 099-173 | | |
| 069-117 | | |
| 035-046 | | |
| 084-290 | | |
| 050-011 | | |
| 076-263 | | |
| 105-192 | | |
| 037-112 | | |
| 032-197 | | |
| 040-109 | | |
| 055-167 (or -169?) | | |
| 071-037 | | |
| 071-124 | | |
| 08037-090-012 | | |
| 06060-102-109 | | |
| 09083-033-107 | | |
| A2640 | | |

# EXHIBIT B

US00PP24439P3

(12) **United States Plant Patent**    (10) Patent No.:    **US PP24,439 P3**

Cain    (45) Date of Patent:    **May 13, 2014**

(54) **GRAPEVINE 'IFG FOUR'**

(50) Latin Name:    *Vitis vinifera*
Varietal Denomination:    **IFG Four**

(75) Inventor:    **David Cain**, Bakersfield, CA (US)

(73) Assignee:    **International Fruit Genetics, LLC**, Bakersfield, CA (US)

( * ) Notice:    Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: 13/134,949

(22) Filed:    **Jun. 22, 2011**

(65)    **Prior Publication Data**

US 2012/0331598 P1    Dec. 27, 2012

(51) **Int. Cl.**
*A01H 5/00*    (2006.01)

(52) **U.S. Cl.**
USPC ........................................ **Plt./205**

(58) **Field of Classification Search**
CPC ............................... A01H 5/0812
USPC ...................................... Plt./205
See application file for complete search history.

(56)    **References Cited**

U.S. PATENT DOCUMENTS

PP16,229 P2    1/2006    Ramming et al.

*Primary Examiner* — Annette Para

(57)    **ABSTRACT**

A new and distinct grapevine variety denominated 'IFG Four' is characterized by producing large, very crisp, dark red, uniform berries with high sugar content borne on medium to large size clusters. The fruit ripen and are commercially harvestable from mid to late August.

**1 Drawing Sheet**

---

## 1

Latin name of the genus and species claimed: *Vitis vinifera*. Variety denomination: 'IFG Four'.

### BACKGROUND OF THE INVENTION

The new and distinct grapevine described and claimed herein originated from a hand pollinated cross of the Autumn Royal variety (non-patented) and the Crimson variety (non-patented) hybridized in May 2001. The abortive seed traces were subsequently embryo cultured and the resulting plant was planted in the field in April 2002. The present variety of grapevine was selected as a single plant in July 2003 and was first asexually propagated by hardwood cuttings in December 2003 near Delano, Kern County, Calif. The resulting propagules were planted during April 2004 near Delano, Kern County, Calif. and were found to reproduce true-to-type through at least three generations of asexual reproduction.

### BRIEF SUMMARY OF THE INVENTION

The new grapevine 'IFG Four' is characterized by producing naturally large, extremely crisp, elongated dark red seedless berries that require little or no exogenous application of Gibberellic acid to obtain commercially acceptable berry size which ripen in mid-season.

To the inventor's knowledge, the known variety to which the new grapevine variety is most similar is the Scarlet Royal (U.S. Plant Pat. No. 16,229). It can be distinguished from this variety based on unique combination of characteristics, which include naturally larger, more crisp, very uniform berries. Berries of IFG Four are more elongated than Scarlet Royal. Natural berry weight is slightly larger and is substantially larger with the application of Gibberellic acid. Acidity of 'IFG Four' is lower than that of Scarlet Royal at a given sugar level. Productivity of 'IFG Four' is somewhat lower

## 2

than Scarlet Royal. 'IFG Four' can further be distinguished based on the characteristics described below.

### BRIEF DESCRIPTION OF THE FIGURE

The accompanying photographic illustration in FIG. 1 illustrates in full color 'IFG Four'. The photograph was taken outdoors with indirect lighting. The colors are as nearly true as is reasonably possible in a color representation of this type.

### DETAILED BOTANICAL DESCRIPTION OF THE INVENTION

Throughout this specification, color names beginning with a small letter signify that the name of that color, as used in common speech, is aptly descriptive. Color names beginning with a capital letter designate values based upon R.H.S. Colour Chart, published by The Royal Horticultural Society, London, England.

Throughout this specification subjective description values conform to those set forth by the International Plant Genetic Resources Institute publication 'Descriptors for Grape' (*vitis* spp.) (1983) which was developed in collaboration with the Office International de la Vigne et du Vin (OIV) and the International Union for the Protection of New Varieties of Plants (UPOV).

The descriptive matter which follows pertains to 'IFG Four' plants grown in the vicinity of Delano, Kern County, Calif. during 2009 and 2010, and is believed to apply to plants of the variety grown under similar conditions of soil and climate elsewhere:

### VINE

General:
*Size.*—Large.
*Vigor.*—Vigorous.

US PP24,439 P3

3

*Density of foliage.*—Dense.
*Productivity.*—Medium productive.
*Root stock.*—Own root.
*Training method.*—Typically spur pruned leaving 2 bud spurs.

Trunk:
*Trunk diameter of 4-year-old vines at 30 cm above the soil line.*—6.7 cm.
*Shape.*—Stocky.
*Straps.*—Short — Split.
*Surface texture.*—Shaggy.
*Inner bark color.*—Greyed orange; 165A.

SHOOTS

Young shoot:
*Form of tip.*—Wide open.
*Distribution of anthocyanin coloration of tip.*—Piping (striped).
*Intensity of anthocyanin coloration of tip.*—Weak.
*Density of prostrate hairs of tip.*—Dense.
*Density of erect hairs of tip.*—Absent.
*Color.*—Can be any of the following colors; Green 144A, and 146B.

Woody shoot (mature canes):
*Shape.*—Medium.
*Internode length.*—Medium; About 11.3 cm.
*Width at node.*—About 1.3 cm.
*Cross section.*—Elliptic.
*Surface.*—Smooth.
*Main color.*—Can be any of the following colors; Yellowish brown; 165B, and 174B.
*Density of erect hairs of nodes.*—None or very sparse.
*Density of erect hairs on internodes.*—None or very sparse.
*Growth of axillary shoots.*—Strong; Approximately 30.6 cm.

Flowering shoot:
*Vigor during flowering.*—Strong.
*Attitude during flowering on shoots not tied.*—Semi-erect.
*Color.*—Dorsal side of internodes — Green — Green with Red stripes.
*Color.*—Ventral side of internodes — Green.
*Color.*—Dorsal side of nodes — Green with Red stripes.
*Color.*—Ventral side of nodes — Green; 144A.
*Density of prostrate hairs of nodes.*—Sparse.
*Density of erect hairs of nodes.*—None.
*Density of prostrate hairs on internode.*—Very sparse.
*Density of erect hairs on internode.*—None.
*Anthocyanin coloration of buds.*—Absent.

Tendrils:
*Distribution on the shoot (at full flowering).*—Discontinuous.
*Length of tendril.*—Medium — Long; About 20.9 cm.
*Thickness.*—Medium.
*Color.*—N144A.
*Form.*—Bifurcated to Trifurcated.
*Number of consecutive tendrils.*—2.

LEAVES

Young leaves:
*Color of upper surface of first four distal unfolded leaves.*—Copper yellow.

4

*Average intensity of anthocyanin coloration of six distal leaves prior to flowering.*—Weak — Medium.
*Density of prostrate hairs between veins (lower surface).*—Very sparse.
*Density of prostrate hairs on veins (lower surface).*—Medium.
*Density of erect hairs between veins (lower surface).*—Absent.
*Density of erect hairs on veins (lower surface).*—Sparse.

Mature leaves:
*Average length.*—About 13.9 cm.
*Average width.*—About 16.9 cm.
*Mature leaf size.*—Large.
*Shape of blade.*—Pentagonal.
*Number of lobes.*—5.
*Anthocyanin coloration of main veins on upper side of blade.*—Absent.
*Mature leaf profile.*—Flat.
*Blistering surface of blade upper surface.*—Weak.
*Leaf blade tip.*—In the plane of the leaf.
*Undulation of margin.*—Slight.
*Thickness.*—Medium.
*Undulation of blade between main and lateral veins.*—Only near petiole.
*Shape of teeth.*—Mixture of both sides straight and both sides convex.
*Length of teeth.*—Medium.
*Ratio length/width of teeth.*—Equal.
*Shape of upper lateral sinuses.*—Closed.
*Depth of upper lateral sinuses.*—Medium.
*General shape petiole sinus.*—Slightly open to Closed.
*Shape of base of upper leaf sinuses.*—V-shaped.
*Tooth at petiole sinus.*—Absent.
*Density of prostrate hairs between veins on lower surface of blade.*—Very sparse.
*Density of erect hairs between veins on lower surface of blade.*—Absent.
*Density of prostrate hairs on main veins on lower surface of blade.*—Sparse-Medium.
*Density of erect hairs on main veins on lower surface of blade.*—Medium.
*Density of prostrate hairs on main veins on upper surface of blade.*—Sparse.
*Density of erect hairs on main veins on upper surface of blade.*—None or very sparse.
*Autumn coloration of leaves.*—Leaves can be a single color or combination of colors, in a mottled pattern or on the edges of the leaves; Yellow 11A, and Yellow-green 153A, and C, and D, and Grey-purple 183A, and B.

Upper surface:
*Color.*—Can be any of the following colors; 137A, and B.
*Anthocyanin coloration of main veins.*—Absent.
*Surface appearance.*—Semi-glossy.
*Blistering surface of blade.*—Very weak.

Lower surface:
*Color.*—Can be any of the following colors; 146A, and B.
*Anthocyanin coloration of main veins (lower surface).*—Absent.
*Glossiness.*—Medium.
*Surface texture.*—Smooth.
*Surface appearance.*—Semi-glossy.

US PP24,439 P3

5

Petiole:
*Length.*—About 15.4 cm.
*Length of petiole compared to middle vein.*—Slightly shorter — Equal.
*Density of prostrate hairs on petiole.*—Sparse.
*Density of erect hairs on petiole.*—None.
Buds:
*Bud fruitfulness.*—Basal: Mostly fruitful.
*Position of first fruitful shoot on previous season cane.*—2nd to 3rd node Time of bud burst — Late; Mar. 17, 2010.

FLOWERS

General:
*Flower sex.*—Hermaphrodite.
*Length of first inflorescence.*—Medium; About 13.6 cm long by 8.0 cm wide.
*Position of first flowering and fruiting node.*—3rd to 5th node (current season growth).
*Number of inflorescence per flowering shoot.*—1.1.
*Time of bloom.*—Late as compared with similar varieties in the growing area of Delano, Calif.
*Date of full bloom.*—May 22, 2010.

FRUIT

General:
*Ripening period.*—Mid — late; Approximately August 20 in a typical year.
*Use.*—Fresh market.
*Keeping quality.*—Medium.
*Resistance to.*—Insects: Average typical of *Vitis vinifera* species. Diseases: Average typical of *Vitis vinifera* specie.
*Shipping quality.*—Medium.
*Refractometer test.*—Soluble-sugar: About 18.4 Brix.
*Brix/acid.*—About 47.6.

6

*Titratable acidity.*—About 0.39.
*Juice pH.*—About 4.2.
Cluster:
*Mature cluster length (peduncle excluded).*—About 32.6 cm.
*Mature cluster width.*—About 13.7 cm.
*Mature cluster weight.*—About 802 gm.
*Bunch density.*—Loose.
*Number of berries.*—About 165.
*Form.*—Cylindrical.
Peduncle:
*Lignification of peduncle.*—Weak — Medium.
*Length of peduncle.*—Approximately 3.9 cm.
Berry:
*Uniformity of size.*—Uniform.
*Single berry weight.*—About 6.0 g natural; to about 9.1 g when treated with gibberellic acid.
*Shape.*—Oblong.
*Seeds.*—Contains small rudimentary seed traces.
*Cross section.*—Circular.
*Berry dimensions.*—Longitudinal axis: About 26.8 mm horizontal axis: About 18.6 mm.
*Berry firmness.*—Firm.
*Particular flavor.*—Neutral.
*Bloom (cuticular wax).*—Medium thick.
*Berry separation from pedicel.*—Medium difficult.
*Skin color (without bloom).*—Red — purple; 59A.
Skin:
*Thickness.*—Thin.
*Texture.*—Medium tough.
*Reticulation.*—Absent.
*Tenacity.*—Tenacious to flesh.
*Tendency to crack.*—Occasional cracks at pedicel.

What is claimed:
**1**. A new and distinct variety of grapevine as herein illustrated and described.

* * * * *

**U.S. Patent**          May 13, 2014          US PP24,439 P3



US00PP24551P3

(12) **United States Plant Patent**
Cain

(10) **Patent No.:**   **US PP24,551 P3**
(45) **Date of Patent:**   **Jun. 17, 2014**

(54) **GRAPEVINE 'IFG ELEVEN'**

(50) Latin Name: **Vitis vinifera**
Varietal Denomination: **IFG Eleven**

(75) Inventor: **David Cain**, Bakersfield, CA (US)

(73) Assignee: **International Fruit Genetics, LLC,**
Bakersfield, CA (US)

( * ) Notice:   Subject to any disclaimer, the term of this
patent is extended or adjusted under 35
U.S.C. 154(b) by 184 days.

(21) Appl. No.: **13/507,265**

(22) Filed: **Jun. 18, 2012**

(65) **Prior Publication Data**

US 2013/0340132 P1   Dec. 19, 2013

(51) **Int. Cl.**
*A01H 5/00*   (2006.01)
(52) **U.S. Cl.**
USPC .......................................................... Plt./207
(58) **Field of Classification Search**
USPC ....................................................... Plt./207
See application file for complete search history.

*Primary Examiner* — Wendy C Haas

(57) **ABSTRACT**

This invention is a new and distinctive grapevine 'IFG Eleven' 'IFG Eleven' produces naturally large, elongated, crisp white seedless berries that require little or no exogenous application of gibberellic acid to obtain commercially acceptable berry size and ripen in mid to late season

**1 Drawing Sheet**

---

**1**

Latin name of the genus and species claimed: *Vitis vinifera*.
Variety denomination: 'IFG Eleven'.

BACKGROUND OF THE INVENTION

The new and distinct grapevine described and claimed herein originated from a hand pollinated cross of the IFG 02013-090-033, an unnamed seedless selection from the IFG breeding program and the IFG 01034-069-026 another unnamed seedless selection from the IFG breeding program hybridized in May 2005. The abortive seed traces were subsequently embryo cultured and the resulting plant was planted in the field in April 2006. The present variety of grapevine was selected as a single plant in September 2007 and was first asexually propagated by hardwood cuttings in December 2007. The resulting propagules were planted during April 2008 near Delano, Kern County, Calif. and were found to reproduce true-to-type through at least two generations of asexual reproduction.

BRIEF SUMMARY OF THE INVENTION

The new grapevine 'IFG Eleven' is characterized by producing naturally large, narrow elliptic, seedless berries having very small residual seed traces. Berries are firm, crisp in texture and ripen in mid to late season. Fruits normally ripen in early September near Delano, Calif.

To the inventor's knowledge, the known variety which the new grapevine variety is most similar to is the Thompson Seedless variety. 'IFG Eleven' can be distinguished from the Thompson Seedless variety by ripening almost one month later. The flesh of the 'IFG Eleven' is crisper than the flesh of the Thompson Seedless variety. 'IFG Eleven' does not require applications of gibberellin to thin clusters or size berries to obtain commercially acceptable berry size as is required for the Thompson Seedless variety. The 'IFG Eleven' has lower acidity than the Thompson Seedless variety. The 'IFG Eleven' is much more productive than the Thompson Seed-

**2**

less variety and can be spur pruned while Thompson Seedless requires cane pruning to attain commercially acceptable yields.

BRIEF DESCRIPTION OF THE FIGURE

The accompanying photographic illustration in FIG. **1** illustrates in full color 'IFG Eleven'. The colors are as nearly true as is reasonably possible in a color representation of this type.

DETAILED BOTANICAL DESCRIPTION OF THE INVENTION

Throughout this specification, color names beginning with a small letter signify that the name of that color, as used in common speech, is aptly descriptive. Color names beginning with a capital letter designate values based upon R.H.S. Colour Chart, published by The Royal Horticultural Society, London, England.

Throughout this specification subjective description values conform to those set forth by the International Plant Genetic Resources Institute publication 'Descriptors for Grape' (*Vitis* spp.) (1983) which was developed in collaboration with the Office International de la Vigne et du Vin (OIV) and the International Union for the Protection of New Varieties of Plants (UPOV).

The descriptive matter which follows pertains to 'IFG Eleven' plants grown in the vicinity of Delano, Kern County, Calif. during 2010, and is believed to apply to plants of the variety grown under similar conditions of soil and climate elsewhere:

VINE

General:
    *Size.*—Medium.
    *Vigor.*—Medium to Weak.
    *Density of foliage.*—Medium to Weak.
    *Productivity.*—Very productive.
    *Root stock.*—Own root.
    *Training method.*—Typically spur pruned leaving 2 bud spurs.

US PP24,551 P3

**3**

Trunk:
  *Trunk diameter of 4-year-old vines at 30 cm above the soil line.*—5.5 cm.
  *Shape.*—Medium.
  *Straps.*—Short — Split.
  *Surface texture.*—Medium rough.
  *Inner bark color.*—Yellow-Brown; 164A, 165A, B.

SHOOTS

Young shoot:
  *Form of tip.*—Fully opened.
  *Distribution of anthocyanin coloration of tip.*—Absent.
  *Intensity of anthocyanin coloration of tip.*—Absent.
  *Density of prostrate hairs of tip.*—Sparse.
  *Density of erect hairs of tip.*—Absent.
  *Color.*—Yellow-Green; 144A, 146A, B, C.
Woody shoots (mature canes):
  *Shape.*—Medium.
  *Internode length.*—Short; About 8.5 cm.
  *Width at node.*—About 0.9 cm.
  *Cross section.*—Circular.
  *Surface.*—Striate.
  *Main color.*—Yellowish brown; 174B, 177A, B, C.
  *Density of erect hairs of nodes.*—None.
  *Density of erect hairs on internodes.*—None.
  *Growth of axillary shoots.*—Medium; Approximately 26.2 cm.
Flowering shoot:
  *Vigor during flowering.*—Strong.
  *Attitude during flowering on shoots not tied.*—Semi-erect.
  *Color.*—Dorsal side of internodes — Green with Red stripes.
  *Color.*—Ventral side of internodes — Green.
  *Color.*—Dorsal side of nodes — Green.
  *Color.*—Ventral side of nodes — Green.
  *Density of prostrate hairs of nodes.*—Very sparse.
  *Density of erect hairs of nodes.*—None.
  *Density of prostrate hairs on internode.*—Very sparse.
  *Density of erect hairs on internode.*—None.
  *Anthocyanin coloration of buds.*—Absent.
Tendrils:
  *Distribution on the shoot (at full flowering).*—Discontinuous.
  *Length of tendril.*—Medium; About 22.4 cm.
  *Thickness.*—Medium.
  *Color.*—Yellow-Green; N144A, 152C, 151A.
  *Form.*—Mostly Trifurcated and Quadfurcated.
  *Number of consecutive tendrils.*—2.

LEAVES

Young leaves:
  *Color of upper surface of first four distal unfolded leaves.*—Green.
  *Average intensity of anthocyanin coloration of six distal leaves prior to flowering.*—Absent or very weak.
  *Density of prostrate hairs between veins (lower surface).*—Absent — Very sparse.
  *Density of prostrate hairs on veins (lower surface).*—Very sparse.
  *Density of erect hairs between veins (lower surface).*—Absent.
  *Density of erect hairs on veins (lower surface).*—Very sparse.

**4**

Mature leaves:
  *Average length.*—About 13.4 cm.
  *Average width.*—About 17.5 cm.
  *Mature leaf size.*—Large.
  *Shape of blade.*—Wedge-shaped.
  *Number of lobes.*—5.
  *Anthocyanin coloration of main veins on upper side of blade.*—Absent.
  *Mature leaf profile.*—Undulate.
  *Blistering surface of blade upper surface.*—Medium.
  *Leaf blade tip.*—In the plane of the leaf.
  *Undulation of margin.*—Slight.
  *Thickness.*—Medium.
  *Undulation of blade between main and lateral veins.*—Overall.
  *Shape of teeth.*—Mixture of both sides straight and both sides convex.
  *Length of teeth.*—Medium.
  *Ratio length/width of teeth.*—Small.
  *Shape of upper lateral sinuses.*—Lobes slightly overlapping — strongly overlapping.
  *Depth of upper lateral sinuses.*—Deep.
  *General shape petiole sinus.*—Half open.
  *Shape of base of upper leaf sinuses.*—U-shaped.
  *Tooth at petiole sinus.*—Absent.
  *Density of prostrate hairs between veins on lower surface of blade.*—Very sparse.
  *Density if erect hairs between veins on lower surface of blade.*—Absent.
  *Density of prostrate hairs on main veins on lower surface of blade.*—Sparse.
  *Density of erect hairs on main veins on lower surface of blade.*—Sparse.
  *Density of prostrate hairs on main veins on upper surface of blade.*—Sparse.
  *Density of erect hairs on main veins on upper surface of blade.*—None.
  *Autumn coloration of leaves.*—Grey-Yellow; 161A, B, 163A, B, 162A.
Upper surface:
  *Color.*—Green; 137A, B.
  *Anthocyanin coloration of main veins.*—Absent.
  *Surface appearance.*—Semi-glossy — Dull.
  *Blistering surface of blade.*—Weak — Medium.
Lower surface:
  *Color.*—Green; 146B.
  *Anthocyanin coloration of main veins (lower surface).*—Absent.
  *Glossiness.*—Weak.
  *Surface texture.*—Rugose.
  *Surface appearance.*—Dull.
Petiole:
  *Length.*—About 10.5 cm.
  *Length of petiole compared to middle vein.*—Slightly shorter.
  *Density of prostrate hairs on petiole.*—Sparse.
  *Density of erect hairs on petiole.*—None.
Buds:
  *Bud fruitfulness.*—Basal: Mostly fruitful.
  *Position of first fruitful shoot on previous season cane.*—1st to 2nd node.
  *Time of bud burst.*—Medium; Mar. 10, 2010.

US PP24,551 P3

5

## FLOWERS

General:
*Flower sex.*—Hermaphrodite.
*Length of first inflorescence.*—Medium; About 21.3 cm long by 12.3 cm wide.
*Position of first flowering and fruiting node.*—3rd-4th node (current season growth).
*Number of inflorescence per flowering shoot.*—1.1 to 2.
*Time of bloom.*—Medium — Late as compared with similar varieties in the growing area of Delano, Calif.
*Date of full bloom.*—May 18, 2010.

## FRUIT

General:
*Ripening period.*—Late; Approximately Sep. 16, 2010.
*Use.*—Fresh market.
*Keeping quality.*—Excellent.
*Resistance to.*—Insects: Average typical of *Vitis vinifera* species. Diseases: Average typical of *Vitis vinifera* species.
*Refractometer test.*—Solid-sugar: About 18.8 Brix.
*Brix/acid.*—About 72.3.
*Titratable acidity.*—About 0.26.
*Juice pH.*—About 4.0.
Cluster:
*Mature cluster length (peduncle excluded).*—About 35.8 cm.
*Mature cluster width.*—About 14.8 cm.
*Mature cluster weight.*—About 1384 g.

6

*Bunch density.*—Medium.
*Number of berries.*—About 236.
*Form.*—Conical.
Peduncle:
*Lignification of peduncle.*—Weak.
*Length of peduncle.*—Medium Approximately 5.0 cm.
Berry:
*Uniformity of size.*—Slightly Variable.
*Single berry weight.*—About 8.9 g natural; to about 9.7 g when treated with gibberellic acid.
*Shape.*—Narrow elliptic.
*Seeds.*—Absent.
*Cross section.*—Circular.
*Berry dimensions.*—Longitudinal axis: About 31.1 mm. Horizontal axis: About 21.6 mm.
*Berry firmness.*—Medium.
*Particular flavor.*—Neutral.
*Bloom (cuticular wax).*—Medium.
*Berry separation from pedicel.*—Medium.
*Skin color (without bloom).*—Yellow-green; N144D, 145A, 151A.
Skin:
*Thickness.*—Medium.
*Texture.*—Medium.
*Reticulation.*—Absent.
*Tenacity.*—Tenacious to flesh.

What is claimed:
1. A new and distinct variety of grapevine as herein illustrated and described.

\* \* \* \* \*

**U.S. Patent**              Jun. 17, 2014          US PP24,551 P3



# EXHIBIT C

C0017A

**INTERNATIONAL FRUIT GENETICS**
**PROPRIETARY CULTIVAR PLANTING RIGHTS**
**LICENSE AGREEMENT**
**Cultivar A-2640**

This Agreement (the "Agreement") is made (for identification purposes only) as of March 1, 2006, by and between International Fruit Genetics, LLC, a California limited liability company ("IFG"), and R.B. Sandrini Farms, L.P., a California limited partnership (the "Licensee").

## RECITALS

A.      IFG is a licensee of that certain hybrid *vitis* cultivar (the "Licensed Cultivar") known under the generic name of A-2640 under that certain Non-Exclusive University of Arkansas Selection License Agreement For Selection A-2640 dated as of March 31, 2005 (the "Master License Agreement"), by and between IFG and the University of Arkansas. Pursuant to the Master License Agreement, IFG has the right to sub-license third parties to grow and sell Fruit from the Licensed Cultivar.

B.      Licensee owns or leases agricultural land in the Territory, plants, cultivates, maintains and harvests table grape vineyards, and markets and sells table grapes.

C.      IFG wishes to grant to Licensee, and Licensee agrees to accept from IFG, a limited license to grow and sell Fruit from the Licensed Cultivar, subject to and in strict accordance with the terms and conditions set forth below.

NOW THEREFORE, IFG and Licensee (each sometimes singly, a "Party", and both sometimes collectively, the "Parties") do hereby covenant and agree as follows:

## TERMS AND CONDITIONS

1.      <u>Definitions</u>. IFG and Licensee hereby agree that capitalized terms, not otherwise defined herein, shall have meanings set forth in Exhibit A attached hereto. In addition, the following terms shall have the following meanings:

"**Property**" means the smaller in area of (a) the real property described in Schedule 1.1 attached hereto, or (b) the area (if any) determined pursuant to Section 9.11 hereof; provided, however, that Licensee may, from time to time, designate another or additional real property as the Property; provided, however, that such other or additional real property is reasonably suited to the cultivation and growth of Plant Material and Plants as contemplated herein, and that Licensee shall have no right to designate any such other or additional real property unless and until Licensee has (i) agreed to have such other or additional real property mapped in accordance with Section 9.11 hereof at Licensee's sole cost and expense, and (ii) received the IFG's prior written consent, which consent the IFG shall not unreasonably withhold or delay.

"**Property Owner**" means the legal owner of title to the Property under the laws of the Territory. Property Owner may be the Licensee or any third party.

1

2.     Grant of Limited License.

2.1.     Limited Use Sublicense. IFG hereby grants a non-exclusive, non-transferable, sublicense (the "Limited Use Sublicense") to Licensee to receive, use and possess (but not own) such Organic Material and IFG Confidential Information related to the Licensed Cultivar as Licensee is entitled to receive hereunder, for the sole and exclusive purpose of enabling Licensee (and no one else) to plant and cultivate the Licensed Cultivar on the Property (and nowhere else) solely for the purpose of growing Fruit on the Property and selling Fruit anywhere in the world, all strictly in accordance with the express terms and conditions hereof. The Limited Use Sublicense shall automatically terminate and expire (without notice or action of any kind by either Party) upon the soonest of any termination or expiration of this Agreement. Licensee understands and agrees that:

(a) IFG may grant other or similar licenses or sublicenses to other Persons in the Territory or elsewhere, and may enter into other agreements or transactions of any kind with other Persons concerning any IFG Confidential Information and/or any Organic Material; and

(b) The Limited Use Sublicense is not transferable in whole or in part by Licensee; and any Disposition (or attempted Disposition) made, suffered or permitted by Licensee of the Limited Use Sublicense or any rights or obligations related thereto shall constitute a material breach by Licensee which shall entitle IFG to terminate this Agreement immediately and otherwise to exercise all of IFG's rights and remedies arising by reason of such breach.

2.2.     Planting Pools. From time to time, IFG may establish one or more Planting Pools. As of the date of this Agreement, IFG has established only the Planting Pools set forth on Schedule 2.2 attached hereto. Each planting agreement, including this Agreement, for the Licensed Cultivar in the Territory executed by IFG shall be associated with a particular Planting Pool. This Agreement is associated with the Planting Pool indicated on Schedule 2.2 attached hereto (the "Associated Planting Pool"). With respect to any particular Planting Pool, IFG hereby agrees that IFG shall not sign planting rights agreements associated with such Planting Pool which, in the aggregate, permit the planting of more acres of the Licensed Cultivar in the Territory than are specified in such Planting Pool.

2.3.     Authorized Acres. Pursuant to the Limited Use Sublicense granted herein, Licensee shall have the right to plant up to a maximum of that number acres of the Licensed Cultivar on the Property set forth on Schedule 2.2 attached hereto (the "Authorized Acres"). This Agreement may be one of a series of similar planting rights agreements associated with the Associated Planting Pool which may be signed by IFG with Licensee and other growers with respect to planting of the Licensed Cultivar in the Territory.

2.4.     Planting Obligation. By the second anniversary of the effective date of this Agreement, Licensee shall have planted all of the Authorized Acres to the Licensed Cultivar. If adverse weather conditions, crop failure or other unusual circumstance prevents the planting from being carried out during the time periods provided herein, Licensee may request in writing, and IFG shall not unreasonably withhold its consent to, one or more additional years to complete the planting of all of the Authorized Acres to the Licensed Cultivar. If Licensee has not planted

all of the Authorized Acres to the Licensed Cultivar within the time periods provided herein, Licensee shall not have the right to plant the unplanted portion of the Authorized Acres to the Licensed Cultivar, and, for the purposes of this Agreement, the Authorized Acres shall be redefined and reduced to the number of acres actually planted by the Licensee to the Licensed Cultivar on the Property.

2.5.   Additional Planting Agreements – Associated Planting Pool. From time to time, Licensee may request that IFG enter into additional planting rights agreements associated with the Associated Planting Pool pursuant to which Licensee would be authorized to plant additional acres of the Licensed Cultivar in the Territory. IFG may accept or decline such requests, at IFG's sole discretion. If IFG accepts such request, Licensee and IFG shall enter into a separate, but substantially similar, planting rights agreement associated with the Associated Planting Pool identifying the property on which the planting will occur, and specifying the number of authorized acres to be planted to the Licensed Cultivar thereon. Licensee hereby acknowledges that IFG may refuse to enter into additional planting rights agreements with Licensee for the following reasons (among others): (a) that Licensee has not complied with the terms of this Agreement or any other planting rights agreements between IFG, or any member of the IFG Group of Companies, and Licensee; or (b) IFG has already entered into planting rights agreements with other growers which combined with the agreements, including this Agreement, signed with Licensee have authorized substantially all of the acres in the Associated Planting Pool.

2.6.   New Planting Pools. From time to time, at IFG's sole discretion, IFG may establish new Planting Pools for the Licensed Cultivar in the Territory in addition to those set forth on Schedule 2.2 attached hereto, by providing written notice to Licensee of the new Planting Pool at least one year prior to the effective date of such establishment. IFG shall consult with Licensee in good faith prior to establishing a new Planting Pool. Notwithstanding the foregoing, IFG shall not establish a new Planting Pool until Licensee and other licensed growers have planted substantially all of the authorized acres for the Licensed Cultivar in the Territory permitted in their respective planting rights agreements associated with all previously established Planting Pools.

2.7.   Right of First Refusal – New Planting Pools. If IFG establishes a new Planting Pool, then, for one year following the establishment of such new Planting Pool, Licensee shall be granted a right of first refusal to execute one or more new planting rights agreements with IFG which, in the aggregate, would permit Licensee to plant that number of authorized acres which bears the same proportion to the new Planting Pool, as the number of acres already planted to the Licensed Cultivar in the Territory by the Licensee bears to the total number of acres already planted to the Licensed Cultivar in the Territory by all the Licensees (including Licensee) under all previously established Planting Pools. Notwithstanding the foregoing, Licensee hereby acknowledges that IFG may refuse to enter into additional planting rights agreements with Licensee pursuant to this Section in the event that Licensee has not complied with the terms of this Agreement or any other agreements between IFG, or any member of the IFG Group of Companies, and Licensee.

3.   IFG's Delivery Obligations.

3

(a) IFG shall deliver to Licensee, in compliance with all applicable Laws, and/or shall authorize Licensee to receive from a Licensed Propagator pursuant to such terms and conditions as Licensee and Licensed Propagator may, at their sole discretion, agree to, such Organic Material and IFG Confidential Information as may be reasonably required for Licensee to produce the Fruit and otherwise to enable Licensee to meet Licensee's obligations hereunder; provided, however, that

(i)   the maximum total number of Plants that Licensee is authorized to grow on the Property (whether grown from grafts of Graftwood or from grafted Plants received from a Licensed Propagator or otherwise) shall be as set forth in Schedule 4.1 hereof;

(ii)  the terms and conditions of any agreement between Licensee and Licensed Propagator shall be set forth in a written contract (the "Licensed Propagator/Licensee Contract"); and

(iii) the Licensed Propagator/Licensee Contract shall (A) be subject to IFG's prior written approval (not to be unreasonably withheld or delayed); (B) designate IFG as a third-party beneficiary thereunder; (C) provide that both parties thereto shall direct a copy of all notices given or received thereunder to IFG; (D) not, in any case, be inconsistent with, or contrary to, Licensee's obligations to IFG hereunder, or the Licensed Propagator's obligations with IFG under the Licensed Propagator Agreement.

Notwithstanding anything to the contrary expressed or implied herein, IFG shall have no liability to Licensee in the event that the Licensed Propagator breaches any obligation that the Licensed Propagator may have to Licensee under the Licensed Propagator/Licensee Agreement or otherwise. Furthermore, nothing expressed or implied herein shall prohibit or in any way restrict IFG's rights and remedies under the Licensed Propagator Agreement or IFG's exercise of such rights or remedies.

(b) IFG shall deliver to Licensee such IFG Confidential Information as may be reasonably required for Licensee to produce the Fruit and otherwise to enable Licensee to meet Licensee's obligations hereunder. Without limiting the generality of the foregoing, IFG shall deliver to Licensee from time to time (and to any Approved Service Provider) Operational Manuals and amendments thereto.

(c) Technology Fee. Licensee shall pay to IFG, prior to any delivery of Plants to Licensee, a one time fee equal to one-half dollar ($0.50) for each Plant delivered to Licensee (the "Technology Fee"). Licensee shall make all payments by wire transfer in United States Dollars to the account in accordance with written instructions provided by IFG from time to time. Licensee shall deliver to IFG with each payment an unaudited statement setting forth in reasonable detail Licensee's calculation of the Technology Fee upon which such payment is based, and such statement shall be certified as true and accurate in all material respects by a responsible officer of Licensee.

4.   Licensee's Horticultural Obligations.

4.1.   Growing and Processing Obligations. In accordance with this Agreement and with such other reasonable written instructions as IFG may from time to time issue to Licensee, Licensee shall take such steps as may be necessary or appropriate to cause the Organic

4

P:\6554\0001\00146669.DOC

Material that Licensee is entitled to receive hereunder to produce Fruit on the Property and otherwise to comply with Licensee's obligations hereunder; and Licensee shall use the Organic Material and IFG Confidential Information for no other purpose. Without limiting the generality of the foregoing, Licensee shall:

(a) cultivate and grow the Plant Material and Plants on the Property (and nowhere else), and (ii) take care of the Plants by pruning and carrying on all necessary horticultural practices;

(b) grow the Fruit on the Plants;

(c) harvest all the Fruit from the Plants;

(d) after harvest, separate Qualified Fruit from Non-Qualified Fruit, and to maintain such separation at all times;

(e) subject to Section 9.2 hereof, market, sell and deliver all Qualified and/or Non-Qualified Fruit produced and harvested by Licensee to such third party customers as a Licensee shall determine, in Licensee's sole discretion;

(f) propagate new Plants by means of "layering" (using a cane from an adjacent Plant to root in the location of a missing Plant), but only in the case where a Plant has died, or been pulled out by the Grower for disease or other similar reason, and only upon the written approval or direction of IFG; provided, however, that the total number of new or layered Plants (together with those already existing on the Property) shall not exceed the maximum number of Plants specified in Schedule 4.1, which maximum number of Plants and the GPS-mapped locations for growing the same may only be changed upon the prior written instruction or approval of IFG, which may be withheld or delayed in IFG's sole and complete discretion;

(g) in carrying out the foregoing: (i) adopt, apply and maintain the best horticultural growing practices in the region of the Property for the cultivation, growth and handling of table grapes; and (ii) be guided at all times by the requirements set out in the Operational Manual;

(h) store, preserve and protect (from spoilage, deterioration, theft, misuse, misappropriation and otherwise) such Organic Material and IFG Confidential Information as Licensee may from time to time possess or control;

(i) sort, package, label and otherwise process Qualified Fruit for distribution to such third party customers as a Licensee shall determine, in Licensee's sole discretion;

(j) deliver processed and packaged Qualified Fruit to such third party customers as a Licensee shall determine, in Licensee's sole discretion,

(k) sort, package, label (as IFG may direct in writing) and otherwise process Non-Qualified Fruit for distribution to such third party customers as a Licensee shall determine, in Licensee's sole discretion;

5

(l)  deliver processed and packaged Non-Qualified Fruit to such third party customers as a Licensee shall determine, in Licensee's sole discretion, (it being understood that IFG may, in IFG's sole discretion, direct that Non-Qualified Fruit may be processed into juice, raisin or other byproducts, or destroyed or otherwise disposed);

(m) hold all Organic Material and IFG Confidential Information for IFG's benefit, keep all of the same entirely separate from other property held by Licensee, and clearly identify all of the same as the property of IFG.

4.2.  <u>Legal Compliance</u>. Licensee shall perform Licensee's obligations hereunder in accordance with all applicable Laws, and Licensee shall obtain and forward to IFG all Clearances.

4.3.  <u>Approved Service Provider</u>. Notwithstanding anything to the contrary expressed or implied herein, Licensee shall have the right to engage a third party to perform any of Licensee's obligations under this Article 4 (an "Approved Service Provider"), subject, however, to the prior fulfillment of the following conditions:

(a)  The Approved Service Provider must be approved in advance by IFG, which approval IFG may withhold or delay in its complete and sole discretion;

(b)  Any engagement by Licensee of an Approved Service Provider must be pursuant to a written contract between the Approved Service Provider and Licensee, the terms and conditions of which shall be subject to IFG's prior approval, which approval IFG may withhold or delay in its complete and sole discretion; without limiting the generality of the foregoing, such contract shall (i) designate IFG as a third-party beneficiary thereunder; (ii) provide that both parties thereto shall direct a copy of all notices given or received thereunder to IFG; (iii) obligate the Approved Service Provider to abide by the terms hereof applicable to Licensee, and not, in any case, be inconsistent with, or contrary to, Licensee's obligations to IFG hereunder, and (iv) provide that IFG shall have no liability to either party in the event that the other party breaches any obligation that it may have to Licensee under such contract or otherwise.

(c)  The Approved Service Provider must deliver to IFG a written contract whereby the Approved Service Provider shall agree to such terms and conditions as IFG may, in its complete and sole discretion, require, including, without limitation, terms substantially similar to those herein which are intended to protect IFG's rights and interests in and to the Organic Material and the IFG Confidential Information; nothing contained herein shall restrict or otherwise limit IFG's exercise of its rights and remedies under any agreement between IFG and the Approved Service Provider.

(d)  Licensee shall (i) remain liable to IFG for any breaches of its obligations hereunder that may occur by reason of the acts or omissions of the Approved Service Provider under the Approved Service Provider's contract with Licensee or otherwise, (ii) indemnify, hold harmless and agree to defend (with counsel reasonably satisfactory to IFG) from and against any Adverse Consequences arising out of or in connection with the acts or omissions of the Approved Service Provider, and (iii) reimburse IFG for any and all of IFG's out-of-pocket

6

legal expenses reasonably incurred by IFG in connection with IFG's work (or its enforcement of its rights and remedies) under this Section 4.3.

5.   Marketers.

5.1.   Marketer/Licensee Contract. Licensee shall be authorized to market and sell the Qualified and/or Non-Qualified Fruit produced from the Licensed Cultivar hereunder through one or more third party fruit marketing companies ("Marketers"). Licensee may enter into one or more separate marketing agreements with such Marketers. The terms of the marketing agreements, including but not limited to, commission rates, payment terms and term, may be determined at the sole discretion of the Marketer and Licensee; provided, however, that (i) the terms and conditions of any agreement between Licensee and Marketer shall be set forth in a written contract (the "Marketer/Licensee Contract"); and (ii) the Marketer/Licensee Contract shall (A) be subject to IFG's prior written approval (not to be unreasonably withheld or delayed); (B) designate IFG as a third-party beneficiary thereunder; (C) provide that both parties thereto shall direct a copy of all notices given or received thereunder to IFG; (D) not, in any case, be inconsistent with, or contrary to, Licensee's obligations to IFG hereunder. Notwithstanding anything to the contrary expressed or implied herein, IFG shall have no liability to Licensee in the event that the Marketer breaches any obligation that the Marketer may have to Licensee under the Marketer/Licensee Agreement or otherwise.

6.   Quality.

6.1.   Quality Standards. Licensee agrees that the nature and quality of all Qualified Fruit sampled, sold, or otherwise disposed of by Licensee shall conform to the standards set by and under the control of IFG set forth in the Operational Manuals.

6.2.   Samples of Qualified Fruit. Licensee shall, upon IFG's reasonable request, supply samples of any Qualified Fruit sampled, sold, or otherwise disposed of by Licensee to IFG. Alternatively, IFG may request Licensee to assure that such Fruit conforms to the quality standards set forth in the Operational Manuals and, to this end, Licensee shall permit reasonable inspection during business hours by an authorized representative of IFG of Licensee's facilities to inspect Licensee's operations, methods of manufacture, materials used, storage and packing areas, and the like, associated with the sale and distribution of Qualified Fruit. Any inspections conducted by IFG to ensure that the quality standards set forth in the Operational Manuals provided herein has been satisfied shall be at the expense of IFG.

6.3.   Other Requirements. IFG shall have the right to impose on Licensee, as necessary, other reasonable specifications or requirements not provided for hereunder to ensure the requisite quality standards set forth in the Operational Manuals with respect to Qualified Fruit sampled, sold, or otherwise disposed of by Licensee.

7.   Royalty.

7.1.   Royalty for Limited Use Sublicense. As consideration for the Limited Use Sublicense granted by IFG to Licensee herein, Licensee shall pay to IFG the Royalty for all Dispositions of Fruit.

7

8.    Payment Terms. Licensee shall pay the Royalty to IFG on or before the last day of the calendar month which follows the calendar month in which the gross revenues for Dispositions of the Fruit are recorded by Licensee. Licensee shall not be permitted to make any deduction for gross revenues recorded but not collected by Licensee, for any reason, including but not limited to, illiquidity, financial difficulty or bankruptcy of Licensee's customers. Licensee shall make all payments by wire transfer in United States Dollars to the account in accordance with written instructions provided by IFG from time to time. Each payment shall be accompanied by an unaudited statement setting forth in reasonable detail Licensee's calculation of the Royalty upon which such payment is based, and such statement shall be certified as true and accurate in all material respects by a responsible officer of Licensee.

9.    Protection of Properties and Rights of IFG and Its Affiliates.

9.1.    Source of Organic Material and IFG Confidential Information. Licensee shall receive all its requirements for Organic Material and IFG Confidential Information exclusively from IFG, the Licensed Propagator (to the extent provided hereinabove) or from such other Person as IFG may from time to time approve or designate in advance in writing. Licensee shall not receive Organic Material or IFG Confidential Information from any other source whatsoever.

9.2.    Fruit Delivery. Licensee shall deliver all Qualified Fruit grown by Licensee exclusively to such third party customers as a Licensee shall determine, in Licensee's sole discretion. Licensee shall deliver all Non-Qualified Fruit grown by Licensee exclusively to such third party customers as a Licensee shall determine, in Licensee's sole discretion, or shall destroy such Non-Qualified Fruit grown by Licensee in accordance with the written instructions of IFG.

9.3.    Security Measures. Licensee shall take all steps necessary or appropriate to prevent the unauthorized Disposition, use or removal, loss, misuse or misappropriation of Organic Material (including, without limitation, any sport, mutation, prunings or cuttings) in Licensee's possession or control. Without limiting the generality of the foregoing, Licensee shall:

(a) Require Property Owner to install, maintain and properly monitor with respect to that portion of the Property where the Organic Material may be situated, such security system as may be prescribed by any Operational Manual from time to time or as IFG may reasonably require; and (ii) appropriate signage (as required by IFG, the PVR or any Law) notifying the public of the PVR and other rights protected thereby and by this Agreement in respect of the Organic Material and of the liability for penalties, damages and other consequences of any Person breaching any of the same;

(b) monitor and supervise Property Owner , all Licensee Affiliates or any other Person who or which comes into contact with any Organic Material by, under or through Licensee, in order to ensure that he, she or it does not do anything which might endanger or prejudice the rights or interests of IFG or any of the IFG Group of Companies in respect thereof;

(c) educate Property Owner, Licensee's Affiliates and any other Person who or which comes into contact with any Organic Material by, under or through Licensee,

about the interests of IFG and the IFG Group of Companies in the Organic Material, and shall provide adequate training to ensure that all such Persons are aware of their and Licensee's obligations hereunder;

(d) not (and not permit, suffer or allow any Property Owner or Licensee Affiliate including, without limitation, Licensee's employees, contractors and service providers or Property Owner's employees, contractors and service providers to):

(i)   propagate, cultivate or otherwise deal with any Organic Material in any way that might seek to replicate any component thereof or to produce any fruit, plant material or component similar thereto;

(ii)   do any act or thing in respect of the Organic Material which would prejudice the grant or enforceability of any PVR rights;

(iii)   contest or challenge in any way the ownership of the PVR, or the right, title and interest of IFG or any of the IFG Group of Companies in or to the IFG Confidential Information or the Organic Material;

(iv)   carry out any research and development initiatives in respect of the Organic Material or to seek or obtain any rights of ownership in respect of any plant variety which is the same as (or similar to) the Licensed Cultivar; or

(e) not allow any Organic Material (including, without limitation, pruning off-cuts), to be removed from the Property, or make (or endeavor to make), suffer or permit a Disposition of any Organic Material in Licensee's possession or control to any Person (other than IFG or such other Person as IFG may designate).

9.4.   Record-Keeping: Reporting. Licensee shall:

(a) deliver to IFG (or IFG's agent) when requested: (i) a report of the status of the volume of Fruit production and of the volume of Qualified and Non-Qualified Fruit ready for distribution to third-parties; and (ii) such other information pertaining to Licensee's operations and performance hereunder as IFG may, from time to time reasonably request;

(b) maintain an up-to-date, accurate and GPS-confirmed identification map showing the number and position of all Organic Material (including, without limitation, all Plants and their locations within the GPS-mapped areas set forth on Schedule 4.1) on the Property, and if any changes to the map occur, deliver an updated, GPS-confirmed map to IFG as soon as practicable after such changes occur; and

(c) keep and maintain true, accurate and up-to-date records of Licensee's growing, harvesting, storage, processing, packaging and other activities relating to the Organic Material, and Licensee's compliance with the terms of this Agreement.

9.5.   IFG's Audit and Inspection Rights. IFG or any other Person designated by IFG in writing shall have the right, at IFG's expense, initially when Licensee's grafting and/or planting of Organic Material is complete, and thereafter from time to time, to audit, inspect and

9

monitor Licensee's use and handling of the Confidential information and the Organic Material and Licensee's performance hereunder. Licensee shall cooperate fully with IFG in this regard, and shall comply with all reasonable requirements of IFG in respect of such auditing, inspection and monitoring.

9.6.    IFG's Rights to Developments. If Licensee creates, obtains or discovers any improvement or supplement to, or development or enhancement of, the IFG Confidential Information or the Organic Material, all of the same shall be the property of, and shall belong exclusively to, IFG, and Licensee shall immediately deliver written notice of the same to IFG, and shall cooperate fully with IFG's efforts to obtain or secure for IFG (or such other Person as IFG may designate) all legal and beneficial rights, titles and interests in or to such improvement, supplement, development or enhancement.

9.7.    Work For Hire. Any work performed by Licensee hereunder and the products of such work, including, without limitation, that which may constitute, lead to, result in or otherwise relate to any and all improvements, supplements, enhancements, developments of, or pertaining to, the Organic Material and/or the IFG Confidential Information, that is eligible for copyright protection in the U.S. or elsewhere shall be a work for hire. If for any reason, any such work or product thereof is deemed for any reason not to be a work for hire, Licensee hereby assigns, conveys and transfers to IFG any and all rights, titles and interests in any copyright in or to such work and products, and all renewals and extensions thereof. Licensee shall provide all assistance reasonably requested by IFG in the establishment, preservation and enforcement of IFG's copyright in such work or products, such assistance to be provided at IFG's expense but without any additional compensation to Licensee. Licensee hereby waives all moral rights relating to such work and products, including, without limitation, any and all rights of identification of authorship and any and all rights of approval, restriction or limitation on use or subsequent modification.

9.8.    Easement. Licensee shall arrange that Property Owner grant to IFG and IFG's duly authorized agents, representatives, contractors and/or employees an irrevocable easement, right of access to, and license to enter, go on, use and occupy, the Property and all other property held or controlled by Property Owner and/or Licensee at all reasonable times for the purpose of enabling IFG to exercise IFG's auditing, inspection, monitoring and other rights hereunder and IFG's rights to destroy and/or remove all Organic Material and IFG Confidential Information and/or otherwise exercise IFG's rights and remedies hereunder (the "Easement"). Upon IFG's request, Licensee shall arrange that Property Owner execute and deliver to IFG a recordable document evidencing the Easement in substantially the form set forth in Exhibit D attached hereto, which document IFG shall be entitle to file and record in the official records of the local jurisdiction wherein the Property is situated.

9.9.    Quitclaim Deed. The Parties understand and agree that all Organic Material (including, without limitation, that which may be now or hereafter affixed to, or growing out of, the Property or that portion of any currently existing vines thereon that may be at or above any graft of any Graftwood) is the property of IFG and not Licensee or Property Owner. Upon IFG's request, Licensee shall arrange that Property Owner execute and deliver to IFG a recordable document evidencing a quitclaim deed to the Organic Material in substantially the form set forth in Exhibit E attached hereto, which document IFG shall be entitled to file and record in the official records of the local jurisdiction wherein the Property is situated. Licensee

10

shall arrange that Property Owner, upon IFG's demand, execute, acknowledge and deliver to IFG such other documents as IFG may from time to time request to establish and to evidence IFG's ownership of the Organic Material. Similarly, upon termination of this Agreement to IFG's satisfaction, IFG shall, if Licensee or Property Owner so requests, deliver a quitclaim deed to Property Owner covering the Property and any tangible personal property thereon.

  9.10. <u>Existing Property Loan</u>. In the event that the Property is presently encumbered by a deed of trust or other monetary lien or encumbrance, Licensee upon IFG's request shall endeavor in good faith to obtain from the holder of such deed of trust, lien or other encumbrance to give IFG notice of any default thereunder, and to recognize IFG's rights under this Agreement.

  9.11. <u>GPS Mapping</u>. Licensee (at no out-of-pocket expense to it) shall cooperate fully with IFG in connection with IFG's efforts to create a Global Positioning Satellite ("GPS") map of the areas wherein the Parties have agreed that Licensee will graft Graftwood, and/or otherwise grow and propagate grafted Plants or other Organic Material, including, without limitation, permitting IFG or its designated representatives reasonable access at all reasonable times to any real property owned or otherwise controlled by Licensee to enable IFG to determine the exact coordinates of such areas for GPS purposes.

  9.12. <u>Notification of Abandonment</u>. Licensee shall provide written notice to IFG of Licensee's decision to remove or abandon the Plants on the Property. Licensee shall cooperate with IFG and otherwise take such steps as may be reasonably necessary, in order to enable IFG to exercise IFG's rights and remedies under this Agreement and/or under the Easement.

  9.13. <u>Termination on Property Default or Disposition</u>. In addition to such other rights to terminate this Agreement as IFG may have elsewhere hereunder or under Law, IFG may, in its complete and unfettered discretion, terminate this Agreement upon (a) the issuance of any notice of default or other notice, claim or demand under any deed of trust, mortgage, lien or encumbrance or other document that could lead to a Property foreclosure or Property Owner's ejectment or dispossession from or of the Property (which notice, claim or demand Licensee shall deliver to IFG as promptly as possible after Property Owner's receipt thereof), or (b) any Disposition of the Property by Property Owner, in either case (a) or (b), whether voluntarily or involuntarily or by operation of Law and effective immediately upon delivery of written notice of such termination to Licensee. Furthermore, Licensee shall cooperate with IFG and otherwise take such steps as may be reasonably necessary, including, without limitation, resisting any third-party effort or action to have a receiver appointed or otherwise to eject or dispossess Property Owner from or of the Property, in order to enable IFG to exercise IFG's rights and remedies under this Agreement and/or under the Easement. Without limiting any other rights or remedies that IFG may have, upon any such termination under this Section 9.13, IFG shall have the rights set forth in Section 11 of the General Terms and Conditions.

  10. <u>Term and Termination</u>. The term of this Agreement shall commence on the date first written above and shall terminate on December 31, 2025 unless terminated earlier in accordance with the terms hereof; provided however, that IFG and Licensee may agree, at their sole discretion, to renew this Agreement for one or more additional periods, which shall be set forth in a writing signed by both parties.

Upon termination of this Agreement, Licensee shall immediately cease all Dispositions of Fruit, shall cooperate in good faith with IFG to destroy all Organic Material and IFG Confidential Information in Licensee's possession, at Licensee's sole cost and expense, and shall pay to IFG all Royalties which have accrued but not been paid prior to the termination of this Agreement.

11.    <u>General Terms and Conditions</u>. IFG and Licensee agree to abide by the general terms and conditions set forth in Exhibit F attached hereto, which are incorporated herein by reference and made a part of this Agreement as if they had been fully set forth herein.

P:\6554\0001\00146669.DOC

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date set forth above.

OWNER:

INTERNATIONAL FRUIT GENETICS, LLC

*David W. Cain* 9-13-07

By David Cain, Its Manager

Address for Notice:

441 Vineland Road
Bakersfield, CA 93307
Telephone: 661-725-5074


LICENSEE:

R.B. SANDRINI FARMS, L.P.

By

Its:  General Partner


Address for Notice:

R.B. SANDRINI FARMS, L.P.
10889 Casey Avenue
Delano, CA 93215
Telephone: 661-725-2281

13

## List of Exhibits

Exhibit A – Definitions

Exhibit B – [intentionally not used]

Exhibit C –[intentionally not used]

Exhibit D –Form of Easement

Exhibit E –Form of Quitclaim Deed

Exhibit F – General Terms and Conditions

Schedule 1.1 – Legal Description of Property

Schedule 2.2 – Planting Pools Established as of the date of this Agreement

Schedule 4.1 – Maximum Plant Numbers by GPS-Mapped Areas

**INTERNATIONAL FRUIT GENETICS**
**EXHIBIT A - DEFINITIONS**

In addition to any other terms defined elsewhere in the Agreement, the following terms have the following meanings:

"**Adverse Consequences**" means all actions, suits, proceedings, hearings, investigations, charges, complaints, claims, demands, injunctions, judgments, orders, decrees, rulings, damages, dues, penalties, fines, costs, amounts paid in settlement, Liabilities, obligations, taxes, liens, losses, disbursements, expenses, and fees, including court costs and attorneys' fees and expenses, in each case: (a) net of any insurance recoveries (except to the extent such recoveries increase the cost of insurance, through retrospective adjustments or otherwise); (b) net of any tax benefit, after taking into account any tax detriment of any indemnity; and (c) after accounting for the time cost of money using the prime rate of the largest (in terms of assets) bank in the Territory as the discount rate.

"**Affiliate**" means any Person who or which may control, be controlled by, or be under common control with, another Person, including, without limitation, the other Person's owners, shareholders, directors, officers, employees, agents, representatives, licensees, permittees, contractors or subcontractors, where control means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract, or otherwise.

"**Agreement**" means this Agreement (as the same may be amended from time to time), and includes all schedules or exhibits attached hereto.

"**Approved Service Provider**" means a third party engaged by Licensee to perform any of Licensee's obligations hereunder.

"**Budwood**" means cuttings from IFG Proprietary Cultivars made for the purpose of field grafting to previously planted and established vines which vines are owned by a Licensed Grower.

"**Change of Control**" means any circumstance whatsoever whereby the Person(s) in control of Licensee at the time of the execution of the Agreement to which this Exhibit is attached ceases to be a controlling party of the Licensee, where "control" (including the terms "controlling," "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of Licensee, whether through the ownership of voting securities, by contract, or otherwise.

"**Clearances**" means any and all permits, consents, approvals, licenses and/or clearances from any and all Governmental Bodies necessary or desirable for Licensee to perform its obligations hereunder in accordance with all applicable Laws.

"**Disposition**" means any sale, lease, hypothecation, abandonment, assignment, delegation, license, encumbrance or other transfer or disposition of any kind, whether voluntary or involuntary or by operation of Law. For all purposes, a Disposition shall be deemed to have occurred if a Change of Control occurs.

"**Embryos**" means all embryos of IFG Proprietary Cultivars.

"**Environmental Law**" means any and all Laws applicable in the Territory: (a) relating to the environment or to emissions, discharges, Releases or threatened Releases of or exposures to polychlorinated biphenyls, pollutants, contaminants, chemicals or industrial, agricultural, toxic or hazardous substances, wastes or Hazardous Materials into the environment, including, without limitation, ambient air, surface water, ground water or land; or (b) otherwise relating to the manufacture, processing, distribution, use, generation, recycling, Release, processing, treatment, storage, disposal, transport, or handling of such polychlorinated biphenyls, pollutants, contaminants, chemicals or industrial, agricultural, toxic or hazardous substances, wastes or Hazardous Materials.

"**FOB Price**" means the free on board ("FOB") selling price invoiced by Licensed Growers for sales of Fruit at any specified destination; provided, however, that the following items, and only the following items, may be deducted if, and only if, they have been included in the FOB price: (a) any customs duties and similar import taxes; (b) any shipping charges and expenses to move Fruit from the cold storage facilities commonly used by the Licensed Grower to the FOB destination, including, but not limited to, custom clearing charges, freight charges, terminal handling charges, freight insurance, and other customary shipping charges; (c) any costs of packaging materials required by the customer; and (d) in the case of sales of Fruit ultimately destined for consumption in the Territory and not exported outside the Territory, value added taxes and other sales taxes.

"**Fruit**" means any and all fruit grown from time to time from the Plants, regardless of the quality or composition thereof.

"**Governmental Body**" means any commonwealth, national, state, territorial, regional, provincial, municipal, parish or local jurisdiction of any kind in the Territory; or any governmental, judicial, legislative, executive or monetary authority or regulatory body, or any subdivision, agency, commission or authority of any such jurisdiction; or any quasi-governmental or private body exercising any regulatory authority thereunder; or any court, arbitrator, grand jury or other judicial or quasi-judicial tribunal, agency or department.

"**Graftwood**" means any Plant Material used or useable for the purposes of grafting existing rootstock or propagating new Plants.

"**Hazardous Materials**" means any hazardous, carcinogenic or toxic material, substance or waste (including, without limitation, gasses, pesticides or any components thereof, asbestos, pollutants, contaminants and petroleum products or any fractions thereof).

"**IFG**" means International Fruit Genetics, LLC, a limited liability company duly organized under the laws of the State of California, U.S., together with its successors and assigns.

"**IFG Confidential Information**" means:

(a)      the Intellectual Property;

(b)     all information and data (technical or non-technical) contained in any Operational Manual;

(c)     the terms, conditions and other provisions of the Agreement;

(d)     all Trade Secrets; and

(e)     any and all information, know-how and data (technical or non-technical) which relates to Organic Material, including, without limitation, all horticultural practices, procedures and techniques which are (or may hereafter be) used to propagate Seed, to graft Graftwood onto existing vines, and/or to cultivate, harvest, store, package, transport or otherwise handle Plant Material and Fruit and which are, may hereafter be, or have been, made available and/or disclosed to Licensee by IFG in connection with this Agreement, except information or material that:

(i) as of the date of receipt by the Licensee is available to the public in a manner not in breach of this Agreement;

(ii) at the time of receipt by the Licensee was known to the Licensee and for which the Licensee can provide evidence of that knowledge to the satisfaction of IFG;

(iii) at any time is received in good faith by the Licensee from a third party who or which is lawfully in possession of the information or material; provided, however, that the third party had the right to transfer the same to the Licensee when it did so;

(iv) the Parties mutually agree in writing to release from the confidentiality and other restrictions contained in this Agreement; or

(v) a Party may be legally required to disclose under applicable Law or to enforce its rights and remedies hereunder.

"**IFG Group of Companies**" means IFG, any subsidiary of IFG and any affiliate of IFG.

"**IFG Proprietary Cultivars**" means any and all cultivars bred, or discovered and developed by any of the IFG Group of Companies (including, without limitation, any sport or mutation), and any and all cultivars to which any of the IFG Group of Companies is the successor in title to the Person who did.

"**Intellectual Property**" means each and all of the following:

(a)     the PVR;

(b)     all proprietary rights to the copyrights in the Operational Manuals;

(c)     all Trade Secrets;

3

(d)    all know-how in the horticultural practices, procedures and techniques now or hereafter developed by any of the IFG Group of Companies (or any Person acting by, under or through the same by assignment, contract or otherwise) pertaining to the Organic Material and/or the propagation, cultivation, harvesting or post-harvesting handling thereof; and

(e)    all other property in, or proprietary rights to, existing or future improvements or developments (including, without limitation, any sports and mutations), patents, plant variety rights, designs, copyrights, logos, business marks, trade secrets, service marks, get-up, trademarks and trade names granted, derived or used by any of the IFG Group of Companies in respect of Organic Material.

**"Laws"** means all applicable statutes, laws (federal, national, state, local, foreign, common or otherwise), treaties, ordinances, regulations, rules, codes, orders, judgments, permits, licenses, certificates, orders, directives, requests for information, notices, writs, injunctions, decrees or like action of any Governmental Body, including, without limitation, any of the foregoing pertaining to Hazardous Materials, agriculture, water, land use or zoning, equal employment opportunities, product labeling, food products, food handling or marketing, or public health and safety.

**"Liability"** means any liability (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due).

**"Licensed Cultivar"** means that certain IFG Proprietary Cultivar which is the subject of this Agreement.

**"Licensed Grower"** means any Person who has signed a Proprietary Cultivar Planting Rights License Agreement with IFG for the Territory.

**"Licensed Propagator"** means any Person who has signed a Propagator Agreement with IFG for the Territory.

**"Licensee Confidential Information"** means:

(a)    the terms, conditions and other provisions of the Agreement; and

(b)    any and all information, know-how and data (technical or non-technical) which relates to Organic Material, including, without limitation, all horticultural practices, procedures and techniques which are (or may hereafter be) used to propagate Seed, to graft Graftwood onto existing vines, and/or to cultivate, harvest, store, package, transport or otherwise handle Plant Material and Fruit and which are, may hereafter be, or have been, made available and/or disclosed to IFG by Licensee in connection with this Agreement, except information or material that:

(i) becomes available to the public in a manner not in breach of this Agreement;

(ii) at the time of receipt by IFG was known to IFG and for which IFG can provide evidence of that knowledge to the satisfaction of the Licensee;

4

(iii) at any time is received in good faith by IFG from a third party who or which is lawfully in possession of the information or material; provided, however, that the third party had the right to transfer the same to IFG when it did so;

(iv) the Parties mutually agree in writing to release from the confidentiality and other restrictions contained in this Agreement; or

(v) a Party may be legally required to disclose under applicable Law or to enforce its rights and remedies hereunder.

"**Limited Use Sub-License**" means a license to receive, use and possess (but not own) Organic Material and IFG Confidential Information related to any IFG Proprietary Cultivar which is the subject of, and for the purposes set forth in, a Planting Rights Agreement.

"**Material Adverse Event**" means any fact, event, occurrence, condition or circumstance that materially and adversely affects, or could reasonably be expected to affect materially and adversely, any of the following: (a) the business, assets or financial condition of the Licensee; (b) the ability of the Licensee to perform its obligation under this Agreement; or (c) the rights or remedies of IFG under this Agreement.

"**Net Proceeds**" means actual revenues received by Licensed Growers for Dispositions of Fruit in transactions which do not qualify as sales; provided, however, that the following items, and only the following items, may be deducted if, and only if, they have been included in the amounts invoiced to customers: (a) any customs duties and similar import taxes; (b) any shipping charges and expenses to move Fruit from the cold storage facilities commonly used by the Licensed Grower to the ultimate destination, including, but not limited to, custom clearing charges, freight charges, terminal handling charges, freight insurance, and other customary shipping charges; (c) any costs of packaging materials required by the customer; (d) any costs of pre-cooling and palletization, and (e) in the case of transactions for Fruit ultimately destined for consumption in the Territory and not exported outside the Territory, value added taxes and other sales taxes.

"**Non-Qualified Fruit**" means Fruit which does not meet the standards to be Qualified Fruit.

"**Operational Manuals**" means all documentation and written instructions (including, without limitation, grower manuals, systems manuals and best horticultural practice statements) and other directives as IFG may from time to time distribute to Licensee setting forth the recommended growing standards, vineyard and vine maintenance requirements and techniques, quality control specifications and other guidelines in relation to (among other things) the cultivation of the Plants, the production and harvesting of the Fruit, and the post-harvesting handling, processing, packaging and shipment thereof.

"**Organic Material**" means all the Fruit, the Graftwood, the Plants, the Plant Material, the Ovules, the Pollen, the Embryos, and the Seeds produced from IFG Proprietary Cultivars, that either may be provided to the Licensee by IFG or the Licensed Propagator from time to time, or are grown or otherwise developed from the same by the Licensee, or otherwise comes into the

5

Licensee's possession; Organic Material does not include (among other things) that portion of any existing vine on the Property which is below any graft of Graftwood.

"**Ovules**" means all ovules of IFG Proprietary Cultivars.

"**Person**" means an individual natural person, a corporation, a partnership, an association, a trust or any other entity or organization, including, without limitation, a Governmental Body.

"**Plants**" means the plants produced from IFG Proprietary Cultivars (including plants growing on their own roots, and plants produced by grafting Graftwood on rootstocks).

"**Plant Material**" means all plants and plant material of IFG Proprietary Cultivars (but excluding the Fruit and Seed).

"**Planting Pool**" means a specific number of acres determined and set by IFG as an aggregate limit, at a particular point in time, to the number of acres which may be planted to a particular IFG Proprietary Cultivar in the Territory by all Licensees licensed to plant that particular IFG Proprietary Cultivar under Planting Rights Agreements. For each IFG Proprietary Cultivar, IFG may establish one Planting Pool, and then, from time to time, any number of additional Planting Pools, at its sole discretion.

"**Planting Rights Agreement**" means the Proprietary Cultivar Planting Rights License Agreement which grants a Licensed Grower the right to plant a particular IFG Proprietary Cultivar in the Territory and market such IFG Proprietary Cultivar.

"**Pollen**" means all pollen of IFG Proprietary Cultivars.

"**Propagator Agreement**" means an agreement which grants a Person the right to propagate IFG Proprietary Cultivars in the Territory.

"**PVR**" means the proprietary and plant variety rights which have been granted or may be granted in the future in respect of IFG Proprietary Cultivars pursuant to: the laws of the United States and the other countries in the Territory and any other Law now or hereafter applicable to the granting of proprietary rights in protected varieties or products applied for and granted from time to time in respect of IFG Proprietary Cultivars.

"**Qualified Fruit**" means Fruit which meets the standards of quality as set for in the Operations Manual.

"**Royalty**" shall mean

(a) five (5%) percent of the FOB Price invoiced by Licensed Growers for sales of the Qualified Fruit

(b) five (5%) percent of the Net Proceeds received by Licensed Growers for Dispositions of the Qualified Fruit in transactions which do not qualify as sales;

(c) three (3%) percent of the FOB Price invoiced by Licensed Growers for sales of the Non-Qualified Fruit; and

(d) three (3%) percent of the Net Proceeds received by Licensed Growers for Dispositions of the Non-Qualified Fruit in transactions which do not qualify as sales.

"**Seed**" means the seed of IFG Proprietary Cultivars.

"**Territory**" means the states of California and Arizona in the United States of America.

"**Trade Secrets**" means in respect of the Organic Material and the IFG Group of Companies;

(a) horticultural know-how, processes and techniques;

(b) propagation, grafting, cultivation, harvesting, handling, storage, packing, processing and other know-how, processes and techniques;

(c) the contractual arrangements between IFG and its suppliers, growers, customers, business associates or any other Person;

(d) the terms and conditions of this Agreement, and the financial details (including fees and royalties) relating to this Agreement or IFG's business; and/or

(e) any other sensitive information relating to IFG's marketing strategies.

"**U.S.**" means the United States of America.

**INTERNATIONAL FRUIT GENETICS**
**EXHIBIT D – FORM OF EASEMENT**

**[see attached]**

WHEN RECORDED, MAIL TO:

Jay M. Behmke
Carle, Mackie, Power & Ross LLP
100 B Street, Suite 400
Santa Rosa, CA 95401      | FOR RECORDER'S USE:

# INTERNATIONAL FRUIT GENETICS
## EASEMENT GRANT DEED

THIS EASEMENT GRANT DEED is made as of _____ \_\_, 2007, by R.B. Sandrini Farms, a California limited partnership and Glen T. Conley and Hazel C. Conley, Trustees of the Glen T. Conley and Hazel C. Conley Family Trust dated August 24, 1997 ("Grantor"), in favor of International Fruit Genetics, LLC, a California limited liability company ("Grantee").

A. Grantor is the owner of the real property located in the unincorporated area of Kern County, California, commonly known as a Kern County Assessor's Parcel(s) No(s). 520-170-18-01-3 and 520-170-18-02-2, which is more particularly described in Exhibit A attached hereto and incorporated herein by reference (the "Property").

B. R.B. Sandrini Farms and Grantee are parties to certain Proprietary Cultivar Planting Rights License Agreements (the "Agreement").

C. Pursuant to the Agreement, Grantor has agreed to grant an easement to Grantee for the purposes set forth herein.

NOW THEREFORE:

1. Grant of Easement. For good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, Grantor does hereby grant, bargain, sell and convey to Grantee, its heirs, successors, executors, administrators and assigns, an nonexclusive easement and right of access to enter, go upon and otherwise use the Property for the purposes set forth herein forever.

2. Easement to Run with the Land. The easement granted herein shall run with the land and shall bind and inure to the benefit of the parties and their respective heirs, successors, executors, administrators and assigns.

3. Purposes. This easement is being granted for the purposes of enabling, permitting, allowing and/or otherwise authorizing the Grantee to exercise its rights and remedies under the

P:\6554\0001\00158787.DOC

Agreement, including, but not limited to, the right of the Grantee under Section 9.5 of the Agreement to audit, inspect and monitor the performance of the Grantor, and the right of the Grantee under Section 11.1 of Exhibit F – General Terms and Conditions to the Agreement that to go on the Property to recover and/or destroy any Organic Material and any Confidential Information (as such terms are defined in the Agreement) may now or hereafter exist on the Property, whether or not attached to the Property and whether or not such Organic Material or Confidential Information may be deemed real or personal property.

IN WITNESS WHEREOF, Grantor has executed this Easement Grant Deed as of the date set forth below.

GRANTOR:

R.B. SANDRINI FARMS, a California limited partnership

Signature: _____

Print Name: _____

Title: _____

Dated: _____

Executed at _____, _____
                      (city)         (state)

GLEN T. CONLEY AND HAZEL C. CONLEY FAMILY TRUST DATED AUGUST 24, 1997

Signature: _____
           Glen T. Conley, Trustee

Signature: _____
           Hazel C. Conley, Trustee

Dated: _____

Executed at _____, _____
                      (city)         (state)

STATE OF CALIFORNIA                )
                                   )  ss:
COUNTY OF _____              )


     On _____, 2007 before me, _____, a Notary Public personally appeared _____, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.


                                    Signature_____


STATE OF CALIFORNIA                )
                                   )  ss:
COUNTY OF _____              )


     On _____, 2007 before me, _____, a Notary Public personally appeared _____, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.


                                    Signature_____


STATE OF CALIFORNIA                )
                                   )  ss:
COUNTY OF _____              )


     On _____, 2007 before me, _____, a Notary Public personally appeared _____, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.


                                    Signature_____

EXHIBIT A

Legal description of Grantor's Parcel

All of that real property in the unincorporated area of the County of Kern, State of California, described as follows:

THE SOUTHEAST QUARTER OF SECTION 17, TOWNSHIP 25 SOUTH, RANGE 25 EAST, M.D.B.M., IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA.

EXCEPTING THEREFROM ONE-HALF ALL GAS, OIL AND OTHER HYDRO-CARBON SUBSTANCES IN, UPON OR UNDER SAID PREMISES OR ANY PORTION THEREOF AND THE RIGHT TO PROSPECT FOR THE SAME AND TO DRILL FOR AND TO PRODUCE AND TAKE AWAY THE SAME AND LIKEWISE RESERVING UNTO THEM AND TO THEIR HEIRS, SUCCESSORS AN ASSIGNS THE RIGHT TO ENTER UPON SAID PREMISES FOR THE ABOVE MENTIONED PURPOSES FROM TIME TO TIME WITH DUE REGARD TO THE USE OF THE SAME BY THE GRANTEES, AS RESERVED BY JOHN H. ALCOCK AND MARY F. ALCOCK IN DEED RECORDED DECEMBER 20, 1944 IN BOOK 1221, PAGE 187 OF OFFICIAL RECORDS.

APN: 520-170-18-01-3 and 520-170-18-02-2

**INTERNATIONAL FRUIT GENETICS**
**EXHIBIT E – FORM OF QUITCLAIM DEED**


**[see attached]**

WHEN RECORDED, MAIL TO:

Jay M. Behmke
Carle, Mackie, Power & Ross LLP
100 B Street, Suite 400
Santa Rosa, CA 95401

FOR RECORDER'S USE:

## INTERNATIONAL FRUIT GENETICS
## QUITCLAIM DEED

THIS QUITCLAIM DEED is made as of _____ __, 2007, by R.B. Sandrini Farms, a California limited partnership and Glen T. Conley and Hazel C. Conley, Trustees of the Glen T. Conley and Hazel C. Conley Family Trust dated August 24, 1997 ("Grantor"), in favor of International Fruit Genetics, LLC, a California limited liability company ("Grantee").

A. Grantor is the owner of the real property located in the County of Kern, State of California, commonly known as a Kern County Assessor's Parcel(s) No(s). 520-170-18-01-3 and 520-18-02-2, which is more particularly described in Exhibit A attached hereto and incorporated herein by reference (the "Property").

B. R.B. Sandrini Farms and Grantee are parties to certain Proprietary Cultivar Planting Rights License Agreements, (the "Agreement").

C. Pursuant to the Agreement, Grantor has agreed to quitclaim to Grantee as provided herein.

NOW THEREFORE:

For good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, Grantor does hereby remise, release and forever quitclaim to Grantee all right, title and interest Grantor has in any Organic Material and any Confidential Information (as such terms are defined in the Agreement) which may now or hereafter exist on the Property, whether or not attached to the Property and whether or not such Organic Material or Confidential Information may be deemed real or personal property.

Page 1 of 4

P:\6554\0001\00158766.DOC

IN WITNESS WHEREOF, Grantor has executed this Quitclaim Deed as of the date set forth below.

GRANTOR:

R.B. SANDRINI FARMS, a California limited partnership

Signature: _____

Print Name:_____

Title:_____

Dated: _____

Executed at _____, _____
                     (city)        (state)

GLEN T. CONLEY AND HAZEL C. CONLEY FAMILY TRUST
DATED AUGUST 24, 1997

Signature: _____
          Glen T. Conley, Trustee

Signature: _____
          Hazel C. Conley, Trustee

Dated: _____

Executed at _____, _____
                     (city)        (state)

STATE OF CALIFORNIA        )
                                   ) ss:
COUNTY OF _____   )

      On _____, 2007 before me, _____, a Notary Public
personally appeared _____, personally known to me (or proved to
me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within
instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and
that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s)
acted, executed the instrument.

WITNESS my hand and official seal.


                                  Signature_____


STATE OF CALIFORNIA        )
                                   ) ss:
COUNTY OF _____   )

      On _____, 2007 before me, _____, a Notary Public
personally appeared _____, personally known to me (or proved to
me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within
instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and
that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s)
acted, executed the instrument.

WITNESS my hand and official seal.


                                  Signature_____


STATE OF CALIFORNIA        )
                                   ) ss:
COUNTY OF _____   )

      On _____, 2007 before me, _____, a Notary Public
personally appeared _____, personally known to me (or proved to
me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within
instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and
that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s)
acted, executed the instrument.

WITNESS my hand and official seal.


                                  Signature_____

EXHIBIT A

Legal description of Grantor's Parcel

All of that real property in the unincorporated area of the County of Kern, State of California, described as follows:

THE SOUTHEAST QUARTER OF SECTION 17, TOWNSHIP 25 SOUTH, RANGE 25 EAST, M.D.B.M., IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA.

EXCEPTING THEREFROM ONE-HALF ALL GAS, OIL AND OTHER HYDRO-CARBON SUBSTANCES IN, UPON OR UNDER SAID PREMISES OR ANY PORTION THEREOF AND THE RIGHT TO PROSPECT FOR THE SAME AND TO DRILL FOR AND TO PRODUCE AND TAKE AWAY THE SAME AND LIKEWISE RESERVING UNTO THEM AND TO THEIR HEIRS, SUCCESSORS AN ASSIGNS THE RIGHT TO ENTER UPON SAID PREMISES FOR THE ABOVE MENTIONED PURPOSES FROM TIME TO TIME WITH DUE REGARD TO THE USE OF THE SAME BY THE GRANTEES, AS RESERVED BY JOHN H. ALCOCK AND MARY F. ALCOCK IN DEED RECORDED DECEMBER 20, 1944 IN BOOK 1221, PAGE 187 OF OFFICIAL RECORDS.

APN: 520-170-18-01-3 and 520-170-18-02-2

**INTERNATIONAL FRUIT GENETICS**
**PROPRIETARY CULTIVAR PLANTING RIGHTS AND**
**TRADEMARK LICENSE AGREEMENT**

**SCHEDULE 4.1**
**MAXIMUM PLANT NUMBERS**
**BY GPS-MAPPED AREAS**

| GPS Coordinates | Maximum Number of Plants |
|---|---|
| Area 1: | 10,380 |
| Area 2: | |
| Area 3: | |
| Area 4: | |
| Area 5: | |
| Area 6: | |
| Area 7: | |
| Area 8: | |
| Area 9: | |
| Area 10: | |

P:\6554\0001\00158554.DOC

## INTERNATIONAL FRUIT GENETICS
## EXHIBIT F -- GENERAL TERMS AND CONDITIONS

In addition to the terms and conditions set forth in the Agreement to which this Exhibit is attached, the following General Terms and Conditions shall be in force between the Parties and made an integral part of the Agreement as if set forth in full therein:

1.　Independence Of Licensee Operations. Licensee's Duty. Licensee shall take all steps necessary or desirable to ensure that Licensee, Licensee's Affiliates, all Persons acting by, under or through Licensee, and Licensee's operations, including, without limitation, the performance of Licensee's obligations hereunder, are not deemed or construed by any Person to be those of IFG, it being the Parties' intention that the only legal relationship between them shall be that of two independent third parties having only the contractual relationship set forth in this Agreement. Without limiting the generality of the foregoing:

(a)　Licensee shall never consider or construe or represent this Agreement or the Parties' activities hereunder to be or to have created a partnership or joint venture between Licensee and IFG, nor shall Licensee be vested with any power of agency or any other power or authority to act (or to accept service of process) on behalf or in the name of IFG.

(b)　Licensee shall be solely responsible for all its Affiliates and its and their operations, and Licensee shall take all actions necessary or desirable to ensure that no employment, contractual or other legal relationships between such Persons and IFG shall arise by virtue of this Agreement or Licensee's performance of Licensee's obligations hereunder.

(c)　Licensee has no power or authority, by virtue of the Agreement or otherwise, to act as IFG's agent or otherwise to act in the name or on behalf of IFG.

2.　Dispositions Prohibited. Licensee shall not make (or attempt to make), suffer or permit any Disposition of the Limited Use Sublicense or any rights or obligations pertaining thereto, and any such Disposition (or attempted Disposition) shall be null and void, and shall confer absolutely no rights, titles or interests of any kind to the purported transferee.

3.　IFG Confidential Information. During the term of the Agreement and at all times thereafter, Licensee shall keep the IFG Confidential Information strictly confidential, and shall not directly or indirectly divulge or disclose any IFG Confidential Information to any other Person, other than Licensee Affiliates to whom or which disclosure of IFG Confidential Information may be necessary for Licensee to perform Licensee's obligations hereunder; provided, however, that Licensee shall ensure that any and all Licensee Affiliates to whom or which any such disclosure is made are aware of the confidential nature of the IFG Confidential Information, and Licensee shall, if requested by IFG, obtain and deliver to IFG a confidentiality agreement with terms similar to this Section signed by such Licensee Affiliates and otherwise satisfactory to IFG. Any written instructions, notes, memoranda or records that may constitute IFG Confidential Information even if made by Licensee and regardless of how they may come into Licensee's possession or control, shall be deemed to be the property of IFG and shall be surrendered to IFG upon the soonest of IFG's demand, or any termination or expiration of this Agreement, and Licensee shall not retain any copies thereof or extracts therefrom.

1

4.     Licensee Confidential Information. During the term of the Agreement and at all times thereafter, IFG shall keep the Licensee Confidential Information strictly confidential, and shall not directly or indirectly divulge or disclose any Licensee Confidential Information to any other Person, other than a member of the IFG Group of Companies to whom or which disclosure of Licensee Confidential Information may be necessary for IFG to perform IFG's obligations hereunder; provided, however, that IFG shall ensure that any member of the IFG Group of Companies to whom or which any such disclosure is made are aware of the confidential nature of the Licensee Confidential Information, and IFG shall, if requested by Licensee, obtain and deliver to Licensee a confidentiality agreement with terms similar to this Section signed by such member of the IFG Group of Companies and otherwise satisfactory to Licensee. Any written instructions, notes, memoranda or records that may constitute Licensee Confidential Information even if made by IFG and regardless of how they may come into IFG's possession or control, shall be deemed to be the property of Licensee and shall be surrendered to Licensee upon the soonest of Licensee's demand, or any termination or expiration of this Agreement, and IFG shall not retain any copies thereof or extracts therefrom.

5.     Violations of Rights Prohibited. Licensee shall not violate, infringe upon, impede, dilute, lay claim to, or otherwise harm or diminish any rights, titles and interests that IFG or any of the IFG Group of Companies may now or hereafter have hereunder, or in or to the IFG Confidential Information or the Organic Material (including, without limitation, any improvement, development or enhancement thereof). Without limiting the generality of the foregoing, Licensee shall not contest, deny or challenge in any way the aforesaid rights, titles, or interests.

6.     No Ownership by Licensee. Notwithstanding Licensee's access to or use of the IFG Confidential Information and the Organic Material: (i) Licensee does not hold, and Licensee is not now or hereafter, by virtue of the Agreement or any transactions or activities undertaken hereunder or contemplated hereby, acquiring, receiving, obtaining or otherwise being granted, assigned, licensed, delegated, conveyed or otherwise conferred or vested with, any title, ownership, proprietary, use, access, Disposition, license or other rights, titles or interests of any kind whatsoever in or to the IFG Confidential Information or the Organic Material or in any existing or future development, enhancement, supplement, improvement or discovery with respect thereto (including, without limitation, any sport or mutation), regardless of whether made, commissioned, obtained, discovered or occasioned by Licensee or any other Person; and (ii) Licensee's rights with respect to the IFG Confidential Information and the Organic Material are strictly limited to the Limited Use Sublicense.

7.     Licensee Cooperation. Licensee shall cooperate with IFG's efforts to prevent any Person from infringing the rights of IFG or any of the IFG Group of Companies in or to the IFG Confidential Information and/or the Organic Material, or to seek redress from any such Person or any Governmental Body. Licensee shall immediately inform IFG of any breach of security, unauthorized use or removal, loss, misuse, infringement or misappropriation of the IFG Confidential Information or Organic Material as well as any adverse action of any nature whatsoever exercised on or in relation to this Agreement, the IFG Confidential Information or the Organic Material, by other Persons, and Licensee shall assist (and cooperate fully with) IFG in taking all necessary measures in order to defend the rights and interests of IFG or any of the IFG Group of Companies herein or in such Confidential information or Organic Material, and/or

to pursue any claims against the relevant Persons and/or to recover the subject IFG Confidential Information or Organic Material.

8.   Insurance.

8.1.   Required Coverages and Limits. At all times during the term of the Agreement, Licensee shall, at its own cost and expense, carry and maintain or cause to be carried and maintained the insurance policies listed or otherwise shown or described in Schedule 8.1 attached hereto. Notwithstanding anything to the contrary herein, Licensee shall not be required to carry crop insurance.

8.2.   Additional Insureds; Loss Payees. All insurance hereunder shall name IFG (and such other parties as IFG may designate) as additional insureds as their respective interests may appear. All such policies shall: (a) provide that the same shall not be cancelled or terminated, nor shall there be any reduction in any limitation of liability, any increase in any deductible or co-insurance or any exclusions added to the same, without at least thirty (30) days' prior written notice (or ten (10) days' prior written notice in the case of non-payment of premium or fraud) to each insured and each loss payee named therein; (b) provide for at least thirty (30) days' prior written notice (or ten (10) days' prior written notice in the case of non-payment of premium or fraud) to each insured and each loss payee named therein of the date on which such policies shall terminate by lapse of time if not renewed; (c) provide that the insurer thereunder waives all rights of subrogation against IFG and waives any right of set-off or counterclaim and any other right of deduction whether by attachment or otherwise; (d) be primary without right of contribution from any other insurance carried by or on behalf of any IFG; (e) provide that no Person other than Licensee shall have any liability for any premiums with respect thereto; and (f) include a cross-liability endorsement providing that inasmuch as the policies are written to cover more than one insured, all terms and conditions, insuring agreements and endorsements, with the exception of limits of liability, shall operate in the same manner as if there were a separate policy covering each insured. IFG shall not, by reason of accepting, rejecting, approving or obtaining insurance incur any liability for the existence, nonexistence, form or legal sufficiency thereof, the solvency of any insurer, or the payment of any losses.

8.3.   Certificates. On or prior to the date hereof, and thereafter not less than ten (10) days after the expiration dates of the expiring policies required pursuant hereto, Licensee shall deliver to IFG certificates of insurance issued by the insurers thereunder or by an insurance broker authorized to bind such insurers evidencing the insurance maintained pursuant hereto.

8.4.   Performance by IFG. In the event that Licensee shall fail to maintain insurance as herein provided, IFG may at IFG's option, but without obligation, provide such insurance and, in such event, Licensee shall, within ten (10) days after written demand *from* time to time, reimburse IFG for the cost thereof, together with interest at the rate of ten percent (10%) per annum on such cost from the date of payment of such cost to the date of reimbursement.

8.5.   Separate Insurance of IFG. Nothing herein shall be construed to prohibit IFG from insuring at IFG's own expense its interest in the Organic Material or otherwise, and any insurance so maintained shall not provide for, or result in a reduction of, the coverage or the amounts payable under any of the insurance required to be maintained by Licensee hereunder.

8.6.    <u>Separate Insurance of Licensee.</u> Licensee shall not obtain or carry separate insurance concurrent in form or contributing in the event of loss with that required hereunder, unless IFG is the additional insured thereunder, with loss payable as provided herein. Licensee shall immediately notify IFG whenever any such separate insurance is obtained and shall deliver to IFG the certificates evidencing the same. Licensee shall furnish to IFG information describing in reasonable detail the insurance maintained by Licensee not later than thirty (30) days after the effective date with respect to each policy of such insurance.

9.    <u>Disclaimer of Warranties and Limitation of Liability.</u>

THE ORGANIC MATERIAL AND CONFIDENTIAL INFORMATION IS PROVIDED "AS IS" AND WITHOUT WARRANTY OF ANY KIND AND OWNER EXPRESSLY DISCLAIMS ALL WARRANTIES AND/OR CONDITIONS, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES AND/OR CONDITIONS OF MERCHANTABILITY OR SATISFACTORY QUALITY AND FITNESS FOR A PARTICULAR PURPOSE. LICENSEE IS RELYING SOLELY ON ITS OWN INSPECTION AND ANALYSIS IN ENTERING INTO THE AGREEMENT, AND NOT ON ANY INFORMATION PROVIDED BY OWNER, AND LICENSEE IS PROCEEDING HEREUNDER ON AN "AS IS" BASIS WITH ALL FAULTS CONCERNING THE LIMITED USE SUBLICENSE, THE ORGANIC MATERIAL OR THE CONFIDENTIAL INFORMATION NOW KNOWN OR HEREAFTER DISCOVERED BY LICENSEE.

LICENSEE ACCEPTS ANY AND ALL RISK THAT (i) LICENSEE MAY NOT BE ABLE TO CULTIVATE, GROW, HARVEST, USE, PROFIT OR BENEFIT FROM OR OTHERWISE DISPOSE OF THE ORGANIC MATERIAL OR THE CONFIDENTIAL INFORMATION FOR ANY PURPOSE INTENDED OR DESIRED BY LICENSEE; AND (ii) THE LIMITED USE SUBLICENSE, THE ORGANIC MATERIAL AND/OR THE CONFIDENTIAL INFORMATION MAY NOT HAVE THE UTILITY, VALUE OR BENEFIT EXPECTED BY LICENSEE.

LICENSEE HEREBY DISCLAIMS, WAIVES AND RELEASES OWNER FROM, ANY RIGHT OR CLAIM BASED UPON, ANY WARRANTY, GUARANTY OR REPRESENTATION, ORAL OR WRITTEN, PAST OR PRESENT (BUT NOT FUTURE), WHETHER ARISING BY LAW OR ALLEGEDLY MADE EXPRESSLY OR IMPLIEDLY (INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE) BY OWNER OR ANY AFFILIATE OF OWNER, OF, AS TO, OR CONCERNING THE LIMITED USE SUBLICENSE, THE CONFIDENTIAL INFORMATION AND/OR THE ORGANIC MATERIAL.

LICENSEE IS BEARING ALL RISKS, COSTS AND EXPENSES ASSOCIATED WITH THE PERFORMANCE OF LICENSEE'S OBLIGATIONS HEREUNDER, AND NOTWITHSTANDING ANY CHANGE OF CIRCUMSTANCES OR ANY UNANTICIPATED CIRCUMSTANCES OR DEVELOPMENTS, INCLUDING, WITHOUT LIMITATION, THE LACK OF AN EXISTING OR FUTURE MARKET FOR THE FRUIT, OR AN ACT OF GOD OR OTHER *FORCE MAJEURE,* LICENSEE IS ENTITLED TO RECEIVE NO MONETARY CONSIDERATION FROM OWNER, EXCEPT AS SET FORTH EXPRESSLY IN THE AGREEMENT.

4

10. <u>Events Of Default.</u>

  10.1. Definition. Each of the following shall constitute an "Event of Default" hereunder:

   (a) The failure of Licensee to perform any of its obligations under Section 9 of the Proprietary Cultivar Planting Rights License Agreement, or Section 7 of the Proprietary Cultivar Propagator Agreement, if Licensee is a party to one or more of these agreements.

   (b) Any failure of Licensee to perform any of Licensee's obligations hereunder (other than those covered in subsection (a) above); provided, however, that such failure shall not constitute an Event of Default if (in the opinion of IFG) such failure has been remedied or cured within fifteen (15) days after the date of Licensee's receipt of written notice of such failure from IFG;

   (c) Any failure of Licensee to perform any of Licensee's obligations under any other agreement between IFG and Licensee; provided, however, that such failure shall not constitute an Event of Default if (in the opinion of IFG) such failure has been remedied or cured within fifteen (15) days after the date of Licensee's receipt of written notice of such failure from IFG.

   (d) The commencement of a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to Licensee or its debts under any bankruptcy, insolvency or other similar Law now or thereafter in effect; or the seeking of the appointment of a trustee, receiver, liquidator, custodian or other similar official of Licensee or any substantial part of its property; or Licensee's consent to any such relief; or to the appointment of or the taking of possession by any such official in an involuntary case or other proceeding commenced against Licensee; or any general assignment for the benefit of creditors; or Licensee's failure generally to pay, or its confession or admission in writing of its general inability to pay, its debts as they become due; or Licensee's taking of any action to authorize any of the foregoing.

   (e) The commencement of an involuntary case or other proceeding against Licensee seeking liquidation, reorganization or other relief with respect to Licensee or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect, or the appointment of a trustee, receiver, liquidator, custodian or other similar official of Licensee or any substantial part of its property, and such involuntary case or other proceeding remains undismissed and unstayed for a period of sixty (60) days; or the entry of an order for relief against Licensee under the federal bankruptcy Laws as now or hereafter in effect.

   (f) The occurrence (in the opinion of IFG) of a Material Adverse Event.

   (g) An infringement of the PVR in respect to IFG Proprietary Cultivar caused or permitted by Licensee.

   (h) The Agreement ceases to be, or is claimed by Licensee or any Person acting by, under or through Licensee not to be, fully enforceable and in full force and effect, or

the validity or enforceability of the Agreement is contested by Licensee or any Person acting by, under or through Licensee.

11.    IFG's Remedies.

11.1.    Termination and Expiration Rights. Upon any termination or expiration of the Agreement for any reason whatsoever, Licensee shall immediately: (a) cease all use of the Organic Material and IFG Confidential Information (including, without limitation, all Trade Secrets) in Licensee's possession or control; and (b) deliver the same to IFG, or if so directed by IFG in writing, destroy under the supervision of IFG, all Organic Material and IFG Confidential Information in Licensee's possession or control, and/or cut off vines below the graft of any IFG Proprietary Cultivar in Licensee's possession or control. Should Licensee fail to comply with Licensee's obligations pursuant to this Section 11.1, then IFG or its duly authorized agents, representatives, contractors and/or employees shall be entitled to exercise IFG's rights under the Easement and otherwise to enter upon the Property and/or any other premises of Licensee where the subject Organic Material or IFG Confidential Information may be situated and destroy and/or remove the same.

11.2.    Termination Upon Event of Default. In addition to any and all rights or remedies that IFG may have under Law, hereunder or otherwise, upon any Event of Default, IFG may immediately terminate the Agreement upon delivery of written notice of termination to Licensee.

11.3.    Injunctive Relief. In addition to any and all rights or remedies that IFG may have under Law, hereunder or otherwise, upon any Event of Default, or upon a failure of Licensee to perform Licensee's obligations under Section 3 (IFG Confidential Information) hereof, IFG may seek to obtain and obtain from any Governmental Body of competent jurisdiction a temporary restraining order and/or preliminary or permanent injunction without the posting of a bond and without proof of damages that have been or may be caused to IFG by such breach or threatened breach. Licensee acknowledges that: (a) the foregoing covenant is a material factor to IFG's execution of the Agreement and is necessary and required for the protection of IFG, the IFG Confidential Information and/or the Organic Material; (b) such covenant relates to matters and obligations of Licensee that are of a special, unique and extraordinary character, each of which has special, unique and extraordinary value; and (c) a breach of any of such covenant or obligations will result in irreparable harm and damages to IFG in an amount difficult to ascertain and which cannot be adequately compensated by a monetary award. IFG's election to pursue injunctive relief shall not, however, constitute a waiver or other limitation of IFG's rights to pursue other or additional remedies, including, without limitation, declaratory relief or damages.

11.4.    Presentation of Rights. Termination hereof shall not affect the rights of IFG under this Section 11 (IFG's Remedies), or the rights of either Party in connection with acts, matters or things done, committed, omitted or suffered by either Party before and up to the date of such termination.

11.5.    Reservation of Rights. The exercise of any rights of enforcement hereunder shall not preclude, or be deemed a waiver of, any other enforcement rights or remedies

6

available to either Party in law or otherwise, and each Party expressly reserves its rights in respect of such additional rights and remedies.

12.   Indemnifications.

12.1.   Indemnified Liabilities. In the event a Party (the "Indemnifying Party") breaches (or in the event any third party alleges facts that, if true, would mean that such Indemnifying Party has breached) any of its representations, warranties, agreements or covenants contained in the Agreement, or has caused any Adverse Consequence through the negligence or willful misconduct of such Indemnifying Party, or any owner, shareholder, director, officer, employee, agent or Affiliate of such Indemnifying Party, then the Indemnifying Party shall (and hereby does) indemnify the other Party and its Affiliates (singly and collectively, the "Indemnified Party") from and against any Adverse Consequences which the Indemnified Party may suffer resulting from, arising out of, relating to, in the nature of, or caused by the breach (or the alleged breach) (collectively, the "Indemnified Liabilities"); provided, however, that the Indemnifying Party shall not have any obligation to any Indemnified Party hereunder with respect to any Indemnified Liabilities to the extent such Indemnified Liabilities arise solely from the gross negligence or willful misconduct of that Indemnified Party as determined by a final judgment of a court of competent jurisdiction. To the extent that the undertaking to defend, indemnify, pay and hold harmless set forth in the preceding sentence maybe determined by a final judgment of a court of competent jurisdiction to be unenforceable because it is violative of any Law or public policy, the Indemnifying Party shall contribute the maximum portion that the Indemnifying Party is permitted to pay and satisfy under applicable Law to the payment and satisfaction of all Indemnified Liabilities incurred by the Indemnified Party.

12.2.   Third-Party Claim Notice. If any third party shall notify the Indemnified Party with respect to any matter (a "Third-Party Claim") which may give rise to a claim for indemnification against the Indemnifying Party hereunder, then the Indemnified Party shall promptly notify the Indemnifying Party thereof in writing; provided, however, that no delay on the part of the Indemnified Party in notifying any Indemnifying Party shall relieve the Indemnifying Party from any obligation hereunder unless (and then solely to the extent that) the Indemnifying Party is prejudiced thereby.

12.3.   Defense Counsel Costs. The Indemnified Party shall have the right to select the legal counsel to defend against any Third-Party Claim, subject to the Indemnifying Party's right to approve of such counsel (which approval shall not be unreasonably withheld or delayed). The Indemnifying Party shall, upon receipt of Indemnified Party's written demand therefor, pay or reimburse the Indemnified Party for the fees, costs and expenses charged or incurred by such defense counsel.

12.4.   Nonsatisfaction of Conditions. So long as the Indemnifying Party has accepted liability for all Adverse Consequences of the Third-Party Claim and has paid the defense counsel costs as required in Section 12.3 (Defense Counsel Costs) hereof, the Indemnifying Party may retain separate co-counsel at its sole cost and expense and participate in the defense of the Third-Party Claim, and the Indemnified Party will not consent to the entry of any judgment or enter into any settlement with respect to the Third-Party Claim without the prior written consent of the Indemnifying Party (not to be withheld or delayed unreasonably). However, if such liability has not been accepted by the Indemnifying Party or if such defense

7

counsel costs are not paid by the Indemnifying Party: (a) the Indemnifying Party shall have no right to participate in the defense of the Third-Party Claim; (b) the Indemnified Party may defend against, and consent to the entry of any judgment or enter into any settlement with respect to, the Third-Party Claim; (c) the Indemnifying Party will remain liable to reimburse the Indemnified Party promptly and periodically for the costs of defending against the Third-Party Claim (including attorneys' fees and expenses); and (d) the Indemnifying Party will remain responsible for any Adverse Consequences arising out of, relating to, in the nature of, or caused by the Third-Party Claim.

13.     <u>Limitations On IFG's Liability</u>.

13.1.     <u>Direct Compensatory Damages</u>. Any liability that IFG may have to Licensee for a breach by IFG of IFG's obligations hereunder shall be limited to the direct compensatory damages suffered by Licensee by reason of such breach, and shall not in any event include, indirect, consequential, punitive or exemplary damages, or compensation for lost or anticipated profits, or damages to goodwill.

13.2.     <u>Termination or Expiration</u>. Upon termination or expiration of the Agreement for any reason (other than IFG's breach), Licensee shall be entitled to no compensation of any kind (including, without limitation, any compensation for goodwill that may have accrued due to the efforts of Licensee, or for damages to vines arising by reason of the cutting thereof below the graft of the Graftwood).

14.     <u>Miscellaneous Provisions</u>.

14.1.     <u>Notices</u>. All notices, requests, demands and other communications to either Party hereunder shall be in writing and shall be given to such Party at its address or telecopy or facsimile number set forth in the signature page to this Agreement or such other address or telecopy or facsimile number as such Party may hereafter specify for the purpose of notice to the other Party. Each such notice, request or other communication shall be effective if given: (i) by telecopy or facsimile, when such telecopy or facsimile is transmitted to the telecopy or fax number specified pursuant to this Section 14.1 and a confirmation report is produced by the sender's telecopier or fax machine; (ii) by registered or certified mail, return receipt requested, seventy-two (72) hours after such communication is deposited in the U.S. mails with postage prepaid, addressed as aforesaid; or (iii) by any other means (including, without limitation, reputable overnight courier service) when delivered at the address specified pursuant to this Section 14.1.

14.2.     <u>No Waivers; Remedies Cumulative</u>. No failure or delay by a Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies provided herein shall be cumulative and not exclusive of any rights or remedies provided by law.

14.3.     <u>Amendments and Waivers</u>. Any provision of the Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed by the Parties hereto.

8

14.4.    <u>Successors and Assigns</u>. IFG may assign the Agreement and any of its rights or any of its obligations hereunder to (a) any Person that is a member of the IFG Group of Companies upon written notice to Licensee; or (b) any other Person upon forty-five (45) days prior written notice to Licensee. Licensee shall not make (or attempt to make) a Disposition or transfer of any of Licensee's rights or obligations hereunder without the prior written consent of IFG; provided that IFG shall not unreasonably withhold or delay such consent, it being understood, however, that it shall not be unreasonable for IFG to withhold or to delay such consent if (among things) IFG has reason to doubt the willingness or the ability of the proposed transferee to perform the obligations of Licensee hereunder. Subject to the limitations set forth above, the Agreement shall be binding upon, and inure to the benefit of, the Parties hereto and their respective permitted successors and assigns.

14.5.    <u>Governing Law</u>. The agreement shall be governed by, and construed in accordance with, the laws of the state of California, United States of America (without regard to any principles of conflicts of law).

14.6.    <u>Jurisdiction and Venue</u>. The Parties to this Agreement acknowledge and agree that the courts listed at the end of this section shall be the sole venue and exclusive forums in which to adjudicate any case or controversy arising either, directly or indirectly, under or in connection with this Agreement and the Parties further agree that, in the event of litigation arising our of or in connection with this Agreement in these courts, they will not contest or challenge the jurisdiction or venue of these courts: United States District Court, Central District of California, or a court of similar standing in the Territory.

14.7.    <u>Independence of Covenants</u>. All covenants of Licensee hereunder shall be given independent effect so that, if a particular action or condition is prohibited by any such covenants, the fact that it would be permitted by an exception to, or be otherwise within the limitations of, another covenant shall not avoid the occurrence or continuance of a default or Event of Default if such action is taken or such condition exists.

14.8.    <u>Incorporations; Captions: Interpretive Rules</u>. The preamble, recitals, schedules and exhibits hereto are hereby incorporated into the Agreement and made a part hereof, but the table of contents, captions and section headings appearing herein are included solely for convenience of reference and are not intended to affect the interpretation of any provision of the Agreement. Defined terms used herein in the singular include the plural and *vice versa*. "Hereto", "hereunder", "herein" and "hereof" refer to the Agreement in its entirety, and not to any particular section or portion of the Agreement. All pronouns and all variations thereof will be deemed to refer to the masculine, feminine, or neuter, as the context in which they are used may require.

14.9.    <u>Investigation</u>. Notwithstanding any past, present or future right of either Party to investigate the affairs of the other Party and notwithstanding any past, present or future knowledge of facts determined or determinable by such Party pursuant to such investigation or right of investigation, such Party has the right to rely fully upon the representations, warranties, covenants and agreements now or hereafter made by the other Party hereunder,

14.10.    <u>Time</u>. Time is of the essence of the Agreement.

9

14.11.  <u>Prior Understandings</u>. The Agreement supersedes all prior understandings and agreements (whether written, oral or otherwise), and constitutes the entire agreement between the Parties hereto relating to the subject-matter hereof and the transactions provided for herein.

14.12.  <u>Fair Construction</u>. The terms of the Agreement have been negotiated by the Parties hereto, and the language used in the Agreement shall be deemed to be the language chosen by the Parties hereto to express their mutual intent. The Agreement shall be construed without regard to any presumption or rule requiring construction against the Party causing such instrument or any portion thereof to be drafted, or in favor of the Party receiving a particular benefit under the same.

14.13.  <u>Parties' Relationship</u>. Notwithstanding any provision of the Agreement or any document or transaction contemplated hereby to the contrary: (a) the relationship between IFG on the one hand and Licensee on the other in connection with the Agreement is intended to be, and the Parties specifically agree that it is, limited to a contractual relationship between two third-parties in a commercial transaction between sophisticated commercial entities dealing with each other on an arm's-length basis; and (b) IFG is not intended to be, and the Parties specifically agree that IFG is not, by virtue of the Agreement or the transactions contemplated hereby, a partner, joint venturer, fiduciary, quasi-fiduciary, alter-ego, manager, shareholder, controlling person or other business associate or participant of any kind of Licensee, and IFG intends to assume no such status or any duties, obligations or limitations associated therewith.

14.14.  <u>Counterparts</u>. The Agreement may be executed in any number of counterparts each of which shall be deemed an original and all of which shall constitute one and the same agreement with the same effect as if all Parties had signed the same signature page. Any signature page of the Agreement may be detached from any counterpart of the Agreement and reattached to any other counterpart of the Agreement identical in form hereto but having attached to it one or more additional signature pages. The Parties shall accept facsimile signatures as the equivalent of original ones, but each Party shall endeavor in good faith to deliver to the other Party original signatures as soon as possible after its delivery of facsimile signatures.

14.15.  <u>Parties' Expenses</u>. Each of the Parties shall pay its own costs and expenses incurred in connection with the preparation, negotiation and execution of the Agreement.

14.16.  <u>Prevailing Party</u>. If either Party brings any legal suit, action or proceeding against the other Party arising out of, relating to, or concerning the interpretation or the enforcement of rights and duties hereunder or any transaction related hereto (collectively, an "Action"), the losing Party shall pay to the prevailing Party a reasonable sum for attorneys' fees and shall reimburse all costs (whether or not such costs are otherwise recoverable under the provisions of the jurisdiction under which the Action has been brought) incurred in connection with the prosecution or defense of such Action and/or enforcement of any judgment, order, ruling or award granted therein, all of which shall be deemed to have accrued on the commencement of such Action and shall be paid whether or not such Action is prosecuted to a judgment, order, ruling or award. "Prevailing Party" includes, without limitation, a Party which agrees to dismiss an Action on the other Party's payment of some or all sums allegedly due or

10

performance of some or all of the covenants allegedly breached, or which obtains substantially the relief sought by it.

14.17.  Severability. If any provision of the Agreement or the application of such provision to any Person or circumstance will be held invalid, the remainder of the Agreement or the application of such provision to Persons or circumstances other than those to which it is held invalid will not be affected thereby.

14.18.  Additional Documents and Acts. Each Party shall execute and deliver such additional documents and instruments and shall perform such additional acts as may be necessary or appropriate to effectuate, carry out and perform all of the terms, provisions, and conditions of the Agreement and the transactions contemplated by the Agreement.

14.19.  Third-Party Beneficiaries. Licensee acknowledges and agrees that:

(a)  IFG and each of the IFG Group of Companies (besides IFG) (the "Third-Party Beneficiaries") have material interests in the Organic Material and the IFG Confidential Information that are critical to its business (collectively, "Third-Party interests");

(b)  Each of the Third-Party Beneficiaries is entitled to the benefit of the representations, warranties and covenants of Licensee contained herein to the extent of its Third-Party Interests, and may (as third-party beneficiaries or otherwise) enforce the Agreement against Licensee and sue Licensee as if each such entity were a party hereto; and

(c)  Except as set forth in subsections (a) and (b) above, the Agreement is for the benefit of the Parties and their respective permitted successors and assigns only, and no other Person shall be a third-party beneficiary hereof or otherwise entitled to enforce the provisions hereof.

14.20.  Survival.  All indemnities, rights, remedies, representations and warranties contained herein shall survive the termination or expiration of the Agreement.

11

## INTERNATIONAL FRUIT GENETICS
## SCHEDULE 8.1 - REQUIRED INSURANCE POLICIES TO BE HELD BY LICENSEE

[Describe policies here.]

P:\6554\0001\00115082.DOC

## INTERNATIONAL FRUIT GENETICS
### SCHEDULE 1.1 – LEGAL DESCRIPTION OF PROPERTY

All of the real property located in the unincorporated area of the County of Kern, State of California, United States of America, described as follows:

THE SOUTHEAST QUARTER OF SECTION 17, TOWNSHIP 25 SOUTH, RANGE 25 EAST, M.D.B.M., IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA.

Assessor's Parcel Number:  520-170-18-01-3 and 520-170-18-02-2

Street Address:

10889 Casey Avenue
Delano, CA 93215

Satellite Photo Attached

Assessor's Parcel Map Attached

Planting Allotment: 20 acres

Case 1:15-cv-00101---JLT   Document 1   Filed 01/20/15   Page 75 of 113

 Address





**INTERNATIONAL FRUIT GENETICS**
**PROPRIETARY CULTIVAR PLANTING RIGHTS**
**LICENSE AGREEMENT**
**Cultivar A-2640**

**SCHEDULE 2.2**
**PLANTING POOLS ESTABLISHED**
**AS OF THE DATE OF THIS AGREEMENT**
**AND AUTHORIZED ACRES**

| Established Planting Pools | Number of Acres in Planting Pool | Acres Authorized in this Agreement |
|---|---|---|
| PP1 General - A-2640 | 500 | 20 |
| PP1 Owner1 - A-2640 | 250 | |
| PP1 Owner2 - A-2640 | 250 | |
| | | |
| | | |
| | | |
| Total | 1,000 | |

### INTERNATIONAL FRUIT GENETICS
### PROPRIETARY CULTIVAR PLANTING RIGHTS
### LICENSE AGREEMENT

### SCHEDULE 4.1
### MAXIMUM PLANT NUMBERS
### BY GPS-MAPPED AREAS

| GPS Coordinates | Maximum Number of Plants |
|---|---|
| Area 1: | 10,380 |
| Area 2: | |
| Area 3: | |
| Area 4: | |
| Area 5: | |
| Area 6: | |
| Area 7: | |
| Area 8: | |
| Area 9: | |
| Area 10: | |

# EXHIBIT D

## SETTLEMENT AGREEMENT AND MUTUAL RELEASE

THIS SETTLEMENT AGREEMENT AND MUTUAL RELEASE (the "Settlement Agreement") is made (for identification purposes only) as of June 1, 2009, by and between International Fruit Genetics, LLC, a California limited liability company ("IFG"), and R.B. Sandrini Farms, L.P., a California limited partnership (the "Licensee").

## RECITALS

A.      IFG and Licensee are parties to that certain Proprietary Cultivar Planting Rights License Agreement dated March 1, 2006, (the "Original License Agreement") pursuant to which IFG sub-licensed to Licensee that certain hybrid *vitis* cultivar developed by the University of Arkansas known under the generic name of A-2640 (the "Original Plant Material").

B.      Pursuant to the Original License Agreement, Licensee planted a vineyard with A-2640. After experience with the variety, Licensee has now determined that A-2640 is not suitable for its purposes. Licensee and IFG, without any admission as to liability or otherwise, desire to resolve fully and finally all of the issues related to A-2640.

NOW, THEREFORE, in consideration of the mutual agreements contained herein, the sufficiency of which is acknowledged, the parties agree as follows:

1.      <u>Termination of Original License Agreement</u>. The parties agree that the Original License Agreement is hereby terminated and of no further force and effect, effective as of the date hereof. Licensee acknowledges that A-2640 remains a proprietary variety sub-licensed by IFG from the University of Arkansas, and agrees to comply with the termination provisions of Section 11.1 of Exhibit F of the Original License Agreement; as amended or modified by Section 4 of this Agreement. The parties also agree that the Quit Claim Deed and the Easement Grant Deed executed in connection with the Original License Agreement are hereby terminated and of no further force and effect, effective as of the date hereof. These documents related to Licensee's property on which A-2640 was planted, but have never been recorded.

2.      <u>Replacement License Agreement</u>. Simultaneously with the execution of this Settlement Agreement, Licensee and IFG shall enter into a new Proprietary Cultivar Planting Rights and Trademark License Agreement (the "Replacement License Agreement") in substantially the form attached hereto as Exhibit A, pursuant to which IFG shall license to Licensee that certain hybrid *vitis* cultivar under the generic name of IFG 41-164 (the "Replacement Plant Material") and a trademark SWEET ROMANCE to be used as the proprietary name for IFG 41-164.

3.      <u>Provision of Budwood</u>. IFG has arranged for Licensee to receive, without consideration or payment, such quantities of budwood of the Replacement Plant Material as is reasonably necessary for Licensee to graft over the vineyard originally planted to Original Plant Material. Licensee acknowledges receipt of such budwood.

4.      <u>Grafting Over</u>. IFG hereby grants a non-exclusive, non-transferable, sublicense to Licensee to receive, use and possess (but not own) the Original Plant Material, for the sole and exclusive purpose of acting as rootstock for the Replacement Plant Material. In consideration for

1

this sublicense, Licensee shall not propagate any Original Plant Material in any manner for any purpose, including but not limited to, harvesting cuttings or conducting any form of asexual reproduction to create plant material for use by Licensee or any third party or for the sale, transfer or gift of such plant material to any person.

5.    Mutual Release of Claims. Subject to the execution by Licensee and IFG of the Replacement License Agreement, IFG, on the one hand, and Licensee, on the other hand, on behalf of themselves, their agents, successors and assigns, hereby fully and forever release and discharge the other parties and their officers, directors, employees, agents, representatives, heirs, executors, administrators, successors and assigns, and all other persons acting by, through, under or in concert, with such party, of and from any action, cause of action, lawsuit, debt, lien, contract, liability, claim, demand, damages, loss, cost or expense, whether presently known or unknown, suspected or unsuspected, fixed, unfixed or contingent, including, without limitation, attorneys' fees and costs, that each party now has or may hereafter have against the other party, arising directly or indirectly out of, related to the Original License Agreement, excluding the provisions related to termination set forth in Section 11.1 of Exhibit F thereof. Each party agrees that the release set forth in this section shall be and remain in effect in all respects as a complete general release as to the matters released. Each party shall bear its own expenses, including any attorneys' fees and costs, incurred in connection with the Action and/or this Agreement.

This Settlement Agreement is in no manner intended, nor shall it be interpreted, as prejudicing or affecting claims or causes of action arising after the date of execution of this Settlement Agreement.

6.    Civil Code Section 1542. The parties expressly waive and relinquish all rights and benefits afforded by Section 1542 of the Civil Code of the State of California, and do so understanding and acknowledging the significance of such specific waiver of Section 1542. Section 1542 of the Civil Code of the State of California states as follows:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR."

Each of the Parties acknowledges that he/it has had an opportunity to consult with an attorney to explain the meaning and effect of Civil Code section 1542. Thus, notwithstanding the provisions of Section 1542, and for the purpose of implementing a full and complete release, the parties expressly acknowledge that this Settlement Agreement is intended to include in its effect, without limitation, all claims which the parties do not know or suspect to exist at the time of execution hereof, and that this Settlement Agreement contemplates the extinguishment of any such claim or claims.

7.    No Admission. The parties acknowledge that this settlement is a compromise of disputed claims and that no portion of this Settlement Agreement is to be construed as an admission of liability on the part of any party.

8.     Counsel. Each of the parties acknowledges that they have been advised to discuss the terms of this Settlement Agreement with their attorneys. Each of the parties acknowledges that they have read the Settlement Agreement, or that they have been afforded every opportunity to do so, and that they are fully aware of its contents and legal effects. Each of the parties further acknowledges that they enter into this Settlement Agreement freely, without coercion and based on their own judgment and not in reliance on any representations or promises made by the other party, other than those contained herein.

9.     Warranty of Non-Assignment of Claims. Each of the parties represents and warrants that he or it has not sold, assigned, transferred, conveyed or otherwise disposed of any claim governed by this Settlement Agreement.

10.     No Disparagement. The parties hereto covenant and agree not to make any statements to any third person which would have the effect of placing in question the professional competence of the other party or its officers, directors, employees, agents, successors and assigns.

11.     Confidentiality. The parties agree that all discussions and correspondence leading up to the settlement of this dispute and the terms of this Settlement Agreement shall remain confidential and not be disclosed to any third party except as provided herein below. If asked any questions about the terms and conditions of settlement thereof, or any other contents of the negotiations leading thereto, the parties and their attorneys may state only that the claims have been satisfactorily resolved. Notwithstanding the foregoing, the parties and their attorneys may make disclosure:

> (i) to the extent necessary to enforce or comply with the terms of the Settlement Agreement, or
> (ii) subject to the conditions set forth in the immediately following paragraph, as required by compulsory process or by law or pursuant to the rules and regulations of any regulatory authority having jurisdiction, or
> (iii) to the parties' principals, accountants, and insurers.

In the event that a party ("Responding Party") is served with any subpoena, order or other request seeking disclosure of this Settlement Agreement, testimony relating to its contents, or contents of the negotiations leading thereto, the Responding Party shall promptly give written notice to each of the other parties to this Agreement no later than five (5) working days after the Responding Party or its counsel first receives the subpoena, order or other request. Upon providing proper notification, any party may object to the requested disclosure on the ground of confidentiality or otherwise. If the party objecting to the requested disclosure is not the Responding Party, then such party may intervene in the proceeding and register its objection and the Responding Party shall withhold production pending the results of such objection. All expenses related to such objection shall be incurred by the objecting party.

12.     General Provisions.

    12.1     Entire Agreement. This Settlement Agreement, together with the Licensee GPA, contains the entire agreement between the parties, and supersedes all prior negotiations,

drafts, and other understandings that the parties may have had concerning the subject matter hereof.

12.2    Successors. The provisions of this Settlement Agreement shall inure to the benefit of, and shall be binding upon, the heirs, successors, executors, administrators and assigns of the parties hereto.

12.3    Amendments. This Settlement Agreement may not be amended or modified except by written documents signed by all parties.

12.4    Severability. Whenever possible, each provision of this Settlement Agreement shall be interpreted so as to be effective and valid under applicable law. If any provision of this Settlement Agreement is held to be prohibited by, or invalid under, applicable law, the remainder of this Settlement Agreement and any other application of such provision shall not be affected thereby.

12.5    Counterparts. This Settlement Agreement may be executed in any number of counterparts, and each such counterpart shall be deemed to be an original instrument. All such counterparts together shall constitute one and the same Settlement Agreement.

12.6    Notice. Any notice, demand, request, consent or other communication which any party desires or is required to give to any other party shall be in writing and shall be deemed to have been given when either: (a) delivered in person or by facsimile transfer, or (b) sent by overnight courier or first-class registered or certified mail, postage pre-paid, return receipt requested, addressed to such party at the address set forth following each party's signature to this Settlement Agreement. Any party may designate another address for itself at any time upon written notice to each of the other parties.

12.7    Fax Transmission. The facsimile transmission of a signed copy of this Settlement Agreement or any amendment thereto to the other party or his agent, followed by faxed acknowledgment of receipt, shall constitute delivery of such document.

12.8    Headings. The titles and headings of the various sections of this Settlement Agreement have been inserted only for convenience of reference. They are not part of this Settlement Agreement and may not be used to construe or interpret any of the terms hereof.

12.10    Warranty of Authorized Signatures. Each of the signatories hereto warrants and represents that he/she is of legal age and legally competent to enter into this Settlement Agreement, and that he/she has received express authority to sign on behalf of the entity, and that the entity has waived any right to later challenge this authority.

12.11.    Jurisdiction and Venue. The parties hereto acknowledge and agree that the sole venue and exclusive forum in which to adjudicate any case or controversy arising either, directly or indirectly, under or in connection with this Settlement Agreement shall be the state courts located in  Kern County, California and the parties further agree that, in the event of litigation arising out of or in connection with this Settlement Agreement in these courts, they will not contest or challenge the jurisdiction or venue of these courts.

12.9   <u>Governing Law</u>. This Settlement Agreement shall be governed by, and construed in accordance with, the law of the State of California, without giving effect to principles of conflict of laws.

5

IN WITNESS WHEREOF, the parties have executed this Settlement Agreement as of the date set forth above.


IFG:

INTERNATIONAL FRUIT GENETICS, LLC,
a California limited liability company


_____

By David Cain, Its Manager

Address for Notice:

441 Vineland Road
Bakersfield, CA 93307
Telephone: 661-363-8463


LICENSEE:

R.B. SANDRINI FARMS, L.P.



By: _____

Its: General Partner

Address for Notice:

R.B. SANDRINI FARMS, L.P.
10889 Casey Avenue
Delano, CA 93215
Telephone: 661-725-2281

EXHIBIT A

PROPRIETARY CULTIVAR PLANTING RIGHTS AND
TRADEMARK LICENSE AGREEMENT
Cultivar 41-164

See attached.

# EXHIBIT E

# INTERNATIONAL FRUIT GENETICS
## PROPRIETARY CULTIVAR PLANTING RIGHTS AND
## TRADEMARK LICENSE AGREEMENT
## Cultivar 41-164

This Agreement (the "Agreement") is made (for identification purposes only) as of June 1, 2009, by and between International Fruit Genetics, LLC, a California limited liability company ("IFG"), and R.B. Sandrini Farms, L.P., a California limited partnership (the "Licensee").

## RECITALS

A.      IFG develops, evaluates, patents, and licenses hybrid table grape cultivars in the United States and other countries around the world. IFG has developed and is the owner of that certain hybrid *vitis* cultivar (the "Licensed Cultivar") under the generic name of IFG 41-164. IFG has filed an application to register the trademark SWEET ROMANCE (the "Licensed Trademark") as a proprietary name for IFG 41-164 under the laws of the United States of America, U.S. Application Serial No. 77/701,256.

B.      Licensee owns or leases agricultural land in the Territory, plants, cultivates, maintains and harvests table grape vineyards, and markets and sells table grapes.

C.      IFG wishes to grant to Licensee, and Licensee agrees to accept from IFG, a limited license to grow and sell Fruit from the Licensed Cultivar under the Licensed Trademark, subject to and in strict accordance with the terms and conditions set forth below.

NOW THEREFORE, IFG and Licensee (each sometimes singly, a "Party", and both sometimes collectively, the "Parties") do hereby covenant and agree as follows:

## TERMS AND CONDITIONS

1.      <u>Definitions</u>. IFG and Licensee hereby agree that capitalized terms, not otherwise defined herein, shall have meanings set forth in Exhibit A attached hereto. In addition, the following terms shall have the following meanings:

"**Property**" means the smaller in area of (a) the real property described in <u>Schedule 1.1</u> attached hereto, or (b) the area (if any) determined pursuant to Section 9.9 (GPS Mapping) hereof; provided, however, that Licensee may, from time to time, designate another or additional real property as the Property; provided, however, that such other or additional real property is reasonably suited to the cultivation and growth of Plant Material and Plants as contemplated herein, and that Licensee shall have no right to designate any such other or additional real property unless and until Licensee has (i) agreed to have such other or additional real property mapped in accordance with Section 9.9 (GPS Mapping) hereof at Licensee's sole cost and expense, and (ii) received the IFG's prior written consent, which consent the IFG shall not unreasonably withhold or delay.

"**Property Owner**" means the legal owner of title to the Property under the laws of the Territory. Property Owner may be the Licensee or any third party.

1

2.    Grant of Limited License.

2.1.    Limited Use Sublicense. IFG hereby grants a non-exclusive, non-transferable, sublicense (the "Limited Use Sublicense") to Licensee to receive, use and possess (but not own) such Organic Material and IFG Confidential Information related to the Licensed Cultivar as Licensee is entitled to receive hereunder, for the sole and exclusive purpose of enabling Licensee (and no one else) to plant and cultivate the Licensed Cultivar on the Property (and nowhere else) solely for the purpose of growing Fruit on the Property and selling Fruit anywhere in the world, all strictly in accordance with the express terms and conditions hereof. The Limited Use Sublicense shall automatically terminate and expire (without notice or action of any kind by either Party) upon the soonest of any termination or expiration of this Agreement. Licensee understands and agrees that:

(a) IFG may grant other or similar licenses or sublicenses to other Persons in the Territory or elsewhere, and may enter into other agreements or transactions of any kind with other Persons concerning any IFG Confidential Information and/or any Organic Material; and

(b) The Limited Use Sublicense is not transferable in whole or in part by Licensee; and any Disposition (or attempted Disposition) made, suffered or permitted by Licensee of the Limited Use Sublicense or any rights or obligations related thereto shall constitute a material breach by Licensee which shall entitle IFG to terminate this Agreement immediately and otherwise to exercise all of IFG's rights and remedies arising by reason of such breach.

2.2.    Planting Pools. From time to time, IFG may establish one or more Planting Pools. As of the date of this Agreement, IFG has established only the Planting Pools set forth on Schedule 2.2 attached hereto. Each planting agreement, including this Agreement, for the Licensed Cultivar in the Territory executed by IFG shall be associated with a particular Planting Pool. This Agreement is associated with the Planting Pool indicated on Schedule 2.2 attached hereto (the "Associated Planting Pool"). With respect to any particular Planting Pool, IFG hereby agrees that IFG shall not sign planting rights agreements associated with such Planting Pool which, in the aggregate, permit the planting of more acres of the Licensed Cultivar in the Territory than are specified in such Planting Pool.

2.3.    Authorized Acres. Pursuant to the Limited Use Sublicense granted herein, Licensee shall have the right to plant up to a maximum of that number acres of the Licensed Cultivar on the Property set forth on Schedule 2.2 attached hereto (the "Authorized Acres"). This Agreement may be one of a series of similar planting rights agreements associated with the Associated Planting Pool which may be signed by IFG with Licensee and other growers with respect to planting of the Licensed Cultivar in the Territory.

2.4.    Planting Obligation. By the second anniversary of the effective date of this Agreement, Licensee shall have planted all of the Authorized Acres to the Licensed Cultivar. If adverse weather conditions, crop failure or other unusual circumstance prevents the planting from being carried out during the time periods provided herein, Licensee may request in writing, and IFG shall not unreasonably withhold its consent to, one or more additional years to complete

the planting of all of the Authorized Acres to the Licensed Cultivar. If Licensee has not planted all of the Authorized Acres to the Licensed Cultivar within the time periods provided herein, Licensee shall not have the right to plant the unplanted portion of the Authorized Acres to the Licensed Cultivar, and, for the purposes of this Agreement, the Authorized Acres shall be redefined and reduced to the number of acres actually planted by the Licensee to the Licensed Cultivar on the Property.

2.5.   Additional Planting Agreements – Associated Planting Pool. From time to time, Licensee may request that IFG enter into additional planting rights agreements associated with the Associated Planting Pool pursuant to which Licensee would be authorized to plant additional acres of the Licensed Cultivar in the Territory. IFG may accept or decline such requests, at IFG's sole discretion. If IFG accepts such request, Licensee and IFG shall enter into a separate, but substantially similar, planting rights agreement associated with the Associated Planting Pool identifying the property on which the planting will occur, and specifying the number of authorized acres to be planted to the Licensed Cultivar thereon. Licensee hereby acknowledges that IFG may refuse to enter into additional planting rights agreements with Licensee for the following reasons (among others): (a) that Licensee has not complied with the terms of this Agreement or any other planting rights agreements between IFG or any member of the IFG Group of Companies, and Licensee; or (b) IFG has already entered into planting rights agreements with other growers which combined with the agreements, including this Agreement, signed with Licensee have authorized substantially all of the acres in the Associated Planting Pool.

2.6.   New Planting Pools. From time to time, at IFG's sole discretion, IFG may establish new Planting Pools for the Licensed Cultivar in the Territory in addition to those set forth on Schedule 2.2 attached hereto, by providing written notice to Licensee of the new Planting Pool at least one year prior to the effective date of such establishment. IFG shall consult with Licensee in good faith prior to establishing a new Planting Pool. Notwithstanding the foregoing, IFG shall not establish a new Planting Pool until Licensee and other licensed growers have planted substantially all of the authorized acres for the Licensed Cultivar in the Territory permitted in their respective planting rights agreements associated with all previously established Planting Pools.

2.7.   Right of First Refusal – New Planting Pools. If IFG establishes a new Planting Pool, then, for one year following the establishment of such new Planting Pool, Licensee shall be granted a right of first refusal to execute one or more new planting rights agreements with IFG which, in the aggregate, would permit Licensee to plant that number of authorized acres which bears the same proportion to the new Planting Pool, as the number of acres already planted to the Licensed Cultivar in the Territory by the Licensee bears to the total number of acres already planted to the Licensed Cultivar in the Territory by all the Licensees (including Licensee) under all previously established Planting Pools. Notwithstanding the foregoing, Licensee hereby acknowledges that IFG may refuse to enter into additional planting rights agreements with Licensee pursuant to this Section in the event that Licensee has not complied with the terms of this Agreement or any other agreements between IFG or any member of the IFG Group of Companies and Licensee.

3.    <u>Trademark License</u>.

    3.1.    <u>Grant of License</u>. IFG hereby grants to Licensee, and Licensee hereby accepts, a non-exclusive, non-transferable, worldwide license to use the Licensed Trademark (the "Trademark License") solely in connection with the marketing and sale of Qualified Fruit from the Licensed Cultivar on the terms and conditions set forth herein.

    3.2.    <u>Acknowledgment of Rights</u>. Licensee acknowledges that IFG owns the Licensed Trademark and all rights therein and that nothing in this Agreement shall give Licensee any right, title or interest in or to the Licensed Trademark other than pursuant to the Trademark License granted hereby.

    3.3.    <u>No Inconsistent Action</u>. Licensee agrees that it will do nothing inconsistent with IFG's ownership of the Licensed Trademark and shall not claim adversely to IFG, or assist any third party in attempting to claim adversely to IFG, with regards to such ownership. Licensee agrees that it will not challenge the title of IFG to the Licensed Trademark, oppose any registration thereof, or challenge the validity of this Agreement or the licenses granted herein. Furthermore, Licensee will not register, nor attempt to register, any trade name or trademark which, in whole or in part, incorporates or is confusingly similar to the Licensed Trademark.

    3.4.    <u>Transferability</u>. The Trademark License granted herein includes the right by Licensee to grant sublicenses within the scope of such Trademark License to Licensee's wholly owned subsidiaries, but only for so long as each remains a wholly owned subsidiary. Except as provided in this Article, the Trademark License granted herein shall be nontransferable and nonassignable without the prior written consent of IFG.

    3.5.    <u>Limited Use</u>. Without the prior written approval of IFG, Licensee is not authorized to use the Licensed Trademark in connection with any business activity unrelated to the marketing and sale of Fruit from the Licensed Cultivar.

    3.6.    <u>Trademark Infringement</u>. Licensee shall promptly notify IFG of any and all infringements, imitations, simulations or other illegal use or misuse of the Licensed Trademark which come to Licensee's attention. As the sole owner of the Licensed Trademark, IFG shall determine whether to take any action to prevent the infringement, imitation, simulation or other illegal use or misuse of the Licensed Trademark. Licensee shall render IFG all reasonable assistance in connection with any matter pertaining to the protection, enforcement or infringement of Licensed Trademark, whether in the courts, administrative or quasi-judicial agencies, or otherwise.

    3.7.    <u>Recording</u>. Licensee agrees to assist IFG in recording this Agreement with appropriate government authorities where such recording is required by Laws or where such recording is permitted or desired by IFG. All costs associated with recording this Agreement, the Trademark License granted herein and registering, maintaining, or renewing the Licensed Trademark shall be borne by IFG.

4.    <u>IFG's Delivery Obligations</u>.

(a) IFG shall deliver to Licensee, in compliance with all applicable Laws, and/or shall authorize Licensee to receive from a Licensed Propagator pursuant to such terms and conditions as Licensee and Licensed Propagator may, at their sole discretion, agree to, such Organic Material and IFG Confidential Information as may be reasonably required for Licensee to produce the Fruit and otherwise to enable Licensee to meet Licensee's obligations hereunder; provided, however, that

(i)     the maximum total number of Plants that Licensee is authorized to grow on the Property (whether grown from grafts of Graftwood or from grafted Plants received from a Licensed Propagator or otherwise) shall be as set forth in <u>Schedule 4.1</u> hereof;

(ii)    the terms and conditions of any agreement between Licensee and Licensed Propagator shall be set forth in a written contract (the "Licensed Propagator/Licensee Contract"); and

(iii)   the Licensed Propagator/Licensee Contract shall (A) be subject to IFG's prior written approval (not to be unreasonably withheld or delayed); (B) designate IFG as a third-party beneficiary thereunder; (C) provide that both parties thereto shall direct a copy of all notices given or received thereunder to IFG; (D) not, in any case, be inconsistent with, or contrary to, Licensee's obligations to IFG hereunder, or the Licensed Propagator's obligations with IFG under the Licensed Propagator Agreement.

Notwithstanding anything to the contrary expressed or implied herein, IFG shall have no liability to Licensee in the event that the Licensed Propagator breaches any obligation that the Licensed Propagator may have to Licensee under the Licensed Propagator/Licensee Agreement or otherwise. Furthermore, nothing expressed or implied herein shall prohibit or in any way restrict IFG's rights and remedies under the Licensed Propagator Agreement or IFG's exercise of such rights or remedies.

(b) IFG shall deliver to Licensee such IFG Confidential Information as may be reasonably required for Licensee to produce the Fruit and otherwise to enable Licensee to meet Licensee's obligations hereunder. Without limiting the generality of the foregoing, IFG shall deliver to Licensee from time to time (and to any Approved Service Provider) Operational Manuals and amendments thereto.

(c) Technology Fee. Licensee shall pay to IFG, prior to any delivery of Plants to Licensee, a one time fee equal to one-half dollar ($0.50) for each Plant delivered to Licensee (the "Technology Fee"). Licensee shall make all payments by wire transfer in United States Dollars to the account in accordance with written instructions provided by IFG from time to time. Licensee shall deliver to IFG with each payment an unaudited statement setting forth in reasonable detail Licensee's calculation of the Technology Fee upon which such payment is based, and such statement shall be certified as true and accurate in all material respects by a responsible officer of Licensee.

5.      <u>Licensee's Horticultural Obligations.</u>

5.1.    <u>Growing and Processing Obligations.</u> In accordance with this Agreement and with such other reasonable written instructions as IFG may from time to time issue to Licensee, Licensee shall take such steps as may be necessary or appropriate to cause the Organic

5

Material that Licensee is entitled to receive hereunder to produce Fruit on the Property and otherwise to comply with Licensee's obligations hereunder; and Licensee shall use the Organic Material and IFG Confidential Information for no other purpose. Without limiting the generality of the foregoing, Licensee shall:

(a) cultivate and grow the Plant Material and Plants on the Property (and nowhere else), and (ii) take care of the Plants by pruning and carrying on all necessary horticultural practices;

(b) grow the Fruit on the Plants;

(c) harvest all the Fruit from the Plants;

(d) after harvest, separate Qualified Fruit from Non-Qualified Fruit, and to maintain such separation at all times;

(e) subject to Section 9.2 hereof, market, sell and deliver all Qualified and/or Non-Qualified Fruit produced and harvested by Licensee to such third party customers as a Licensee shall determine, in Licensee's sole discretion;

(f) propagate new Plants by means of "layering" (using a cane from an adjacent Plant to root it in the location of a missing Plant), but only in the case where a Plant has died, or been pulled out by the Grower for disease or other similar reason, and only upon the written approval or direction of IFG; provided, however, that the total number of new or layered Plants (together with those already existing on the Property) shall not exceed the maximum number of Plants specified in Schedule 4.1, which maximum number of Plants and the GPS-mapped locations for growing the same may only be changed upon the prior written instruction or approval of IFG, which may be withheld or delayed in IFG's sole and complete discretion;

(g) in carrying out the foregoing: (i) adopt, apply and maintain the best horticultural growing practices in the region of the Property for the cultivation, growth and handling of table grapes; and (ii) be guided at all times by the requirements set out in the Operational Manual;

(h) store, preserve and protect (from spoilage, deterioration, theft, misuse, misappropriation and otherwise) such Organic Material and IFG Confidential Information as Licensee may from time to time possess or control;

(i) sort, package, label with the Licensed Trademarks and otherwise process Qualified Fruit for distribution to such third party customers as a Licensee shall determine, in Licensee's sole discretion;

(j) deliver processed and packaged Qualified Fruit to such third party customers as a Licensee shall determine, in Licensee's sole discretion,

(k) sort, package, label (as IFG may direct in writing) and otherwise process Non-Qualified Fruit for distribution to such third party customers as a Licensee shall determine, in Licensee's sole discretion;

6

(l)  deliver processed and packaged Non-Qualified Fruit to such third party customers as a Licensee shall determine, in Licensee's sole discretion, (it being understood that IFG may, in IFG's sole discretion, direct that Non-Qualified Fruit may be processed into juice, raisin or other byproducts, or destroyed or otherwise disposed);

(m) hold all Organic Material and IFG Confidential Information for IFG's benefit, keep all of the same entirely separate from other property held by Licensee, and clearly identify all of the same as the property of IFG.

5.2.  <u>Legal Compliance</u>. Licensee shall perform Licensee's obligations hereunder in accordance with all applicable Laws, and Licensee shall obtain and forward to IFG all Clearances.

5.3.  <u>Approved Service Provider</u>. Notwithstanding anything to the contrary expressed or implied herein, Licensee shall have the right to engage a third party to perform any of Licensee's obligations under this Article 5 (an "Approved Service Provider"), subject, however, to the prior fulfillment of the following conditions:

(a)  The Approved Service Provider must be approved in advance by IFG, which approval IFG may withhold or delay in its complete and sole discretion;

(b)  Any engagement by Licensee of an Approved Service Provider must be pursuant to a written contract between the Approved Service Provider and Licensee, the terms and conditions of which shall be subject to IFG's prior approval, which approval IFG may withhold or delay in its complete and sole discretion; without limiting the generality of the foregoing, such contract shall (i) designate IFG as a third-party beneficiary thereunder; (ii) provide that both parties thereto shall direct a copy of all notices given or received thereunder to IFG; (iii) obligate the Approved Service Provider to abide by the terms hereof applicable to Licensee, and not, in any case, be inconsistent with, or contrary to, Licensee's obligations to IFG hereunder, and (iv) provide that IFG shall have no liability to either party in the event that the other party breaches any obligation that it may have to Licensee under such contract or otherwise.

(c)  The Approved Service Provider must deliver to IFG a written contract whereby the Approved Service Provider shall agree to such terms and conditions as IFG may, in its complete and sole discretion, require, including, without limitation, terms substantially similar to those herein which are intended to protect IFG's rights and interests in and to the Organic Material and the IFG Confidential Information; nothing contained herein shall restrict or otherwise limit IFG's exercise of its rights and remedies under any agreement between IFG and the Approved Service Provider.

(d)  Licensee shall (i) remain liable to IFG for any breaches of its obligations hereunder that may occur by reason of the acts or omissions of the Approved Service Provider under the Approved Service Provider's contract with Licensee or otherwise, (ii) indemnify, hold harmless and agree to defend (with counsel reasonably satisfactory to IFG) from and against any Adverse Consequences arising out of or in connection with the acts or omissions of the Approved Service Provider, and (iii) reimburse IFG for any and all of IFG's out-of-pocket

7

legal expenses reasonably incurred by IFG in connection with IFG's work (or its enforcement of its rights and remedies) under this Section 5.3.

6.    Marketers.

6.1.    Marketer/Licensee Contract. Licensee shall be authorized to market and sell the Qualified and/or Non-Qualified Fruit produced from the Licensed Cultivar hereunder through one or more third party fruit marketing companies ("Marketers"). Licensee may enter into one or more separate marketing agreements with such Marketers. The terms of the marketing agreements, including but not limited to, commission rates, payment terms and term, may be determined at the sole discretion of the Marketer and Licensee; provided, however, that (i) the terms and conditions of any agreement between Licensee and Marketer shall be set forth in a written contract (the "Marketer/Licensee Contract"); and (ii) the Marketer/Licensee Contract shall (A) be subject to IFG's prior written approval (not to be unreasonably withheld or delayed); (B) designate IFG as a third-party beneficiary thereunder; (C) provide that both parties thereto shall direct a copy of all notices given or received thereunder to IFG; (D) not, in any case, be inconsistent with, or contrary to, Licensee's obligations to IFG hereunder. Notwithstanding anything to the contrary expressed or implied herein, IFG shall have no liability to Licensee in the event that the Marketer breaches any obligation that the Marketer may have to Licensee under the Marketer/Licensee Agreement or otherwise.

7.    Quality.

7.1.    Quality Standards. Licensee agrees that the nature and quality of all Qualified Fruit sampled, sold, or otherwise disposed of by Licensee under the Licensed Trademark shall conform to the standards set by and under the control of IFG set forth in the Operational Manuals.

7.2.    Samples of Qualified Fruit. Licensee shall, upon IFG's reasonable request, supply samples of any Qualified Fruit sampled, sold, or otherwise disposed of by Licensee under the Licensed Trademark to IFG. Alternatively, IFG may request Licensee to assure that such Fruit conforms to the quality standards set forth in the Operational Manuals and, to this end, Licensee shall permit reasonable inspection during business hours by an authorized representative of IFG of Licensee's facilities to inspect Licensee's operations, methods of manufacture, materials used, storage and packing areas, and the like, associated with the sale and distribution of Qualified Fruit under the Licensed Trademark. Any inspections conducted by IFG to ensure that the quality standards set forth in the Operational Manuals provided herein has been satisfied shall be at the expense of IFG.

7.3.    Samples of Use of Licensed Trademark. Licensee shall deliver to IFG, upon IFG's request and without charge to IFG, representative samples of labels, containers, advertisements, catalogs, letterhead, and the like, containing the Licensed Trademark to enable IFG to ensure that the Licensed Trademark is used only in a manner consistent with the nature and quality of the Qualified Fruit conforming to the quality standards set forth in the Operational Manuals.

7.4.    Other Requirements. IFG shall have the right to impose on Licensee, as necessary, other reasonable specifications or requirements not provided for hereunder to ensure

8

the requisite quality standards set forth in the Operational Manuals with respect to Qualified Fruit sampled, sold, or otherwise disposed of by Licensee under the Licensed Trademark.

8.    Royalty.

8.1.    Royalty. As consideration for the Limited Use Sublicense granted by IFG to Licensee herein, Licensee shall pay to IFG the Royalty for all Disposition of Fruit.

8.2.    Payment Terms. Licensee shall pay the Royalty to IFG on or before the last day of the calendar month which follows the calendar month in which the gross revenues for Dispositions of the Fruit are recorded by Licensee. Licensee shall not be permitted to make any deduction for gross revenues recorded but not collected by Licensee, for any reason, including but not limited to, illiquidity, financial difficulty or bankruptcy of Licensee's customers. Licensee shall make all payments by wire transfer in United States Dollars to the account in accordance with written instructions provided by IFG from time to time. Each payment shall be accompanied by an unaudited statement setting forth in reasonable detail Licensee's calculation of the Royalty upon which such payment is based, and such statement shall be certified as true and accurate in all material respects by a responsible officer of Licensee.

9.    Protection of Properties and Rights of IFG and Its Affiliates.

9.1.    Source of Organic Material and IFG Confidential Information. Licensee shall receive all its requirements for Organic Material and IFG Confidential Information exclusively from IFG, the Licensed Propagator (to the extent provided hereinabove) or from such other Person as IFG may from time to time approve or designate in advance in writing. Licensee shall not receive Organic Material or IFG Confidential Information from any other source whatsoever.

9.2.    Fruit Delivery. Licensee shall deliver all Qualified Fruit grown by Licensee exclusively to such third party customers as a Licensee shall determine, in Licensee's sole discretion. Licensee shall deliver all Non-Qualified Fruit grown by Licensee exclusively to such third party customers as a Licensee shall determine, in Licensee's sole discretion, or shall destroy such Non-Qualified Fruit grown by Licensee in accordance with the written instructions of IFG.

9.3.    Security Measures. Licensee shall take all steps necessary or appropriate to prevent the unauthorized Disposition, use or removal, loss, misuse or misappropriation of Organic Material (including, without limitation, any sport, mutation, prunings or cuttings) in Licensee's possession or control. Without limiting the generality of the foregoing, Licensee shall:

(a) Require Property Owner to install, maintain and properly monitor with respect to that portion of the Property where the Organic Material may be situated, such security system as may be prescribed by any Operational Manual from time to time or as IFG may reasonably require; and (ii) appropriate signage (as required by IFG, the PVR or any Law) notifying the public of the PVR and other rights protected thereby and by this Agreement in respect of the Organic Material and of the liability for penalties, damages and other consequences of any Person breaching any of the same;

9

(b) monitor and supervise Property Owner , all Licensee Affiliates or any other Person who or which comes into contact with any Organic Material by, under or through Licensee, in order to ensure that he, she or it does not do anything which might endanger or prejudice the rights or interests of IFG or any of the IFG Group of Companies in respect thereof;

(c) educate Property Owner, Licensee's Affiliates and any other Person who or which comes into contact with any Organic Material by, under or through Licensee, about the interests of IFG and the IFG Group of Companies in the Organic Material, and shall provide adequate training to ensure that all such Persons are aware of their and Licensee's obligations hereunder;

(d) not (and not permit, suffer or allow any Property Owner or Licensee Affiliate including, without limitation, Licensee's employees, contractors and service providers or Property Owner's employees, contractors and service providers to):

(i)     propagate, cultivate or otherwise deal with any Organic Material in any way that might seek to replicate any component thereof or to produce any fruit, plant material or component similar thereto;

(ii)     do any act or thing in respect of the Organic Material which would prejudice the grant or enforceability of any PVR rights;

(iii)     contest or challenge in any way the ownership of the PVR., or the right, title and interest of IFG or any of the IFG Group of Companies in or to the IFG Confidential Information or the Organic Material;

(iv)     carry out any research and development initiatives in respect of the Organic Material or to seek or obtain any rights of ownership in respect of any plant variety which is the same as (or similar to) the Licensed Cultivar;

(e) not allow any Organic Material (including, without limitation, pruning off-cuts), to be removed from the Property, or make (or endeavor to make), suffer or permit a Disposition of any Organic Material in Licensee's possession or control to any Person (other than IFG or such other Person as IFG may designate); or

(f) dispose of any Organic Material (including, without limitation, any sport, mutation, prunings or cuttings) in a manner which will prevent use or removal, loss, misuse or misappropriation of Organic Material by any Person.

9.4.    <u>Record-Keeping: Reporting</u>. Licensee shall:

(a) deliver to IFG (or IFG's agent) when requested: (i) a report of the status of the volume of Fruit production and of the volume of Qualified and Non-Qualified Fruit ready for distribution to third-parties; and (ii) such other information pertaining to Licensee's operations and performance hereunder as IFG may, from time to time reasonably request;

(b) maintain an up-to-date, accurate and GPS-confirmed identification map showing the number and position of all Organic Material (including, without limitation, all Plants and their locations within the GPS-mapped areas set forth on <u>Schedule 4.1</u>) on the Property, and if any changes to the map occur, deliver an updated, GPS-confirmed map to IFG as soon as practicable after such changes occur; and

(c) keep and maintain true, accurate and up-to-date records of Licensee's growing, harvesting, storage, processing, packaging and other activities relating to the Organic Material, and Licensee's compliance with the terms of this Agreement.

9.5. <u>IFG's Audit and Inspection Rights</u>. IFG or any other Person designated by IFG in writing shall have the right, at IFG's expense, initially when Licensee's grafting and/or planting of Organic Material is complete, and thereafter from time to time, to audit, inspect and monitor Licensee's use and handling of the Confidential information and the Organic Material and Licensee's performance hereunder. Licensee shall cooperate fully with IFG in this regard, and shall comply with all reasonable requirements of IFG in respect of such auditing, inspection and monitoring.

9.6. <u>IFG's Rights to Developments</u>. If Licensee creates, obtains or discovers any improvement or supplement to, or development or enhancement of, the IFG Confidential Information or the Organic Material, all of the same shall be the property of, and shall belong exclusively to, IFG, and Licensee shall immediately deliver written notice of the same to IFG, and shall cooperate fully with IFG's efforts to obtain or secure for IFG (or such other Person as IFG may designate) all legal and beneficial rights, titles and interests in or to such improvement, development or enhancement.

9.7. <u>License Coupled with An Interest</u>. Licensee shall arrange that Property Owner grant to IFG and IFG's duly authorized agents, representatives, contractors and/or employees an irrevocable license coupled with an interest to enter, go on, and use the Property and all other property held or controlled by Property Owner at all reasonable times for the purpose of enabling IFG to exercise IFG's auditing, inspection, monitoring and other rights hereunder and IFG's rights to destroy and/or remove all Organic Material and IFG Confidential Information and/or otherwise exercise IFG's rights and remedies hereunder (the "Real Property License"). Upon IFG's request, Licensee shall arrange that Property Owner execute and deliver to IFG a recordable document evidencing the Real Property License in substantially the form set forth in Exhibit D attached hereto, which document IFG shall be entitle to file and record in the official records of the local jurisdiction wherein the Property is situated.

9.8. <u>Existing Property Loan</u>. In the event that the Property is presently encumbered by a deed of trust or other monetary lien or encumbrance, Licensee upon IFG's request shall endeavor in good faith to obtain from the holder of such deed of trust, lien or other encumbrance to give IFG notice of any default thereunder, and to recognize IFG's rights under this Agreement.

9.9. <u>GPS Mapping</u>. Licensee (at no out-of-pocket expense to it) shall cooperate fully with IFG in connection with IFG's efforts to create a Global Positioning Satellite ("GPS") map of the areas wherein the Parties have agreed that Licensee will graft Graftwood, and/or otherwise grow and propagate grafted Plants or other Organic Material, including, without

limitation, permitting IFG or its designated representatives reasonable access at all reasonable times to any real property owned or otherwise controlled by Licensee to enable IFG to determine the exact coordinates of such areas for GPS purposes.

9.10.   Notification of Abandonment. Licensee shall provide written notice to IFG of Licensee's decision to remove or abandon the Plants on the Property. Licensee shall cooperate with IFG and otherwise take such steps as may be reasonably necessary, in order to enable IFG to exercise IFG's rights and remedies under this Agreement and/or under the Real Property License.

9.11.   Termination on Property Default or Disposition, In addition to such other rights to terminate this Agreement as IFG may have elsewhere hereunder or under Law, IFG may, in its complete and unfettered discretion, terminate this Agreement upon (a) the issuance of any notice of default or other notice, claim or demand under any deed of trust, mortgage, lien or encumbrance or other document that could lead to a Property foreclosure or Property Owner's ejectment or dispossession from or of the Property (which notice, claim or demand Licensee shall deliver to IFG as promptly as possible after Property Owner's receipt thereof), or (b) any Disposition of the Property by Property Owner, in either case (a) or (b), whether voluntarily or involuntarily or by operation of Law and effective immediately upon delivery of written notice of such termination to Licensee. Furthermore, Licensee shall cooperate with IFG and otherwise take such steps as may be reasonably necessary, including, without limitation, resisting any third-party effort or action to have a receiver appointed or otherwise to eject or dispossess Property Owner from or of the Property, in order to enable IFG to exercise IFG's rights and remedies under this Agreement and/or under the Real Property License. Without limiting any other rights or remedies that IFG may have, upon any such termination under this Section 9.13, IFG shall have the rights set forth in Section 11 of the General Terms and Conditions.

10.   Term and Termination. The term of this Agreement shall commence on the date first written above and shall terminate on December 31, 2029 unless terminated earlier in accordance with the terms hereof; provided however, that IFG and Licensee may agree, at their sole discretion, to renew this Agreement for one or more additional periods, which shall be set forth in a writing signed by both parties.

Upon termination of this Agreement, Licensee shall immediately cease all Dispositions of Fruit, shall cooperate in good faith with IFG to destroy all Organic Material and IFG Confidential Information in Licensee's possession, at Licensee's sole cost and expense, and shall pay to IFG all Royalties which have accrued but have not been paid prior to the termination of this Agreement

11.   General Terms and Conditions. IFG and Licensee agree to abide by the general terms and conditions set forth in Exhibit F attached hereto, which are incorporated herein by reference and made a part of this Agreement as if they had been fully set forth herein.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date set forth above.

IFG:

INTERNATIONAL FRUIT GENETICS, LLC,
a California limited liability company


_____

By David Cain, Its Manager

Address for Notice:

441 Vineland Road
Bakersfield, CA 93307
Telephone:  661-363-8463


LICENSEE:

R.B. SANDRINI FARMS, L.P.


By: _____

Its: General Partner

Address for Notice:

R.B. SANDRINI FARMS, L.P.
10889 Casey Avenue
Delano, CA 93215
Telephone: 661-725-2281

<u>List of Exhibits</u>

Exhibit A – Definitions

Exhibit B – [intentionally not used]

Exhibit C – [intentionally not used]

Exhibit D – Form of Real Property License

Exhibit E – [intentionally not used]

Exhibit F – General Terms and Conditions

Schedule 1.1 – Legal Description of Property

Schedule 2.2 – Planting Pools Established as of the date of this Agreement

Schedule 4.1 – Maximum Plant Numbers by GPS-Mapped Areas

P:\6554\0001\00190578.DOC

# EXHIBIT F

# CMPR

## CARLE, MACKIE, POWER & ROSS LLP
### ATTORNEYS

100 B STREET, SUITE 400
SANTA ROSA, CALIFORNIA 95401

TEL:(707) 526-4200
FAX: (707) 526-4707

November 16, 2011

Mr. Richard Sandrini
R. B. Sandrini Farms, L.P.
10889 Casey Avenue
Delano, CA 93215-9316

Re:     International Fruit Genetics, LLC

Dear Mr. Sandrini:

This firm represents International Fruit Genetics, LLC, a California limited liability company ("IFG"), in connection with its licensing of proprietary hybrid table grape cultivars.

Sandrini Farms and IFG are parties to that certain Proprietary Cultivar Planting Rights License Agreement dated March 1, 2006, (the "License Agreement") pursuant to which IFG sub-licensed to your company that certain hybrid *vitis* cultivar developed by the University of Arkansas known under the generic name of A-2640

Sandrini Farms was not pleased with the performance of the A-2640. In 2009, IFG and Sandrini Farms entered into negotiations pursuant to which IFG agreed to provide you with new plant material of that certain hybrid *vitis* cultivar under the generic name of IFG 41-164 sold under the registered trademark SWEET ROMANCE, and you agreed to sign a new replacement license agreement with IFG. IFG met its obligations under the terms of the settlement, and provided to Sandrini Farms, free of charge, budwood of SWEET ROMANCE for the purposes of grafting over the A-2640 vineyard.

Sandrini Farms accepted the budwood and grafted over the vineyard, but did not sign the settlement agreement or the replacement license agreement. It is our understanding that you now take the position that Sandrini Farms does not owe any royalties on the sales of SWEET ROMANCE to IFG.

We believe this position to be profoundly mistaken.

The original License Agreement is still in effect and is not limited to just one variety. The agreement provides that licensee is required to pay royalties on all sales of "Fruit" (Section 7.1). "Fruit" is defined as any and all fruit grown from "Plants." Exhibit A – Definitions. "Plants" are



CARLE, MACKIE, POWER & ROSS LLP

Mr. Richard Sandrini
November 16, 2011
Page 2

defined as any plants produced from any IFG Proprietary Cultivars. Exhibit A – Definitions.
Both A-2640 and IFG 41-164 qualify as IFG Proprietary Cultivars.

 Since the vineyard farmed by Sandrini Farms is composed of grafted plants containing
both A-2640 and IFG 41-164, both of which are IFG Proprietary Cultivars, the original License
Agreement applies to all fruit produced in that vineyard. Royalties are due to IFG under the
original License Agreement.

 This letter constitutes written notice that IFG requests that Sandrini Farms comply with
the terms of Section 7.1 of the original License Agreement and pay royalties on the fruit from
this vineyard. If we do not have written confirmation from you by December 15, 2011, then
IFG will declare that Sandrini Farms is in breach of the original License Agreement, and move to
exercise any and all of its remedies for such breach, including but not limited to, the right to
enter your property and arrange for the destruction of these plants.

 Thank you for your prompt attention to this matter.

     Very truly yours,

     Jay M. Behmke

cc:  client

# EXHIBIT G

**R B SANDRINI FARMS**
**10889 CASEY AVE**
**DELANO, CA  93215**
PHONE: 661-725-2281
FAX: 661-725-2287

DECEMBER 9, 2011

INTERNATIONAL FRUIT GENETICS
441 VINELAND ROAD
BAKERSFIELD, CA 93307

TOTAL 2011 CROP PRODUCTION FOR NICOLO

| | |
|---|---|
| 19959 BOXES @ $14.04 (average price) | $280,224.36 |
| ROYALTY | X  5% |
| **TOTAL ROYALTY DUE** | $14,011.22 |

R.B. SANDRINI FARMS - 10889 CASEY AVE. • DELANO, CA 93215-9316

### R B SANDRINI FARMS

Vendor: INTERNATIONAL FRUIT GENETICS          ID: 453

| Invoice No. | Invoice Date | Description | P.O. No. | Voucher Amt | Discount Amt | Pay Amount |
|---|---|---|---|---|---|---|
| | Dec 09, 2011 | 2011 ROYALTY FOR NICOLO | | 14,011.22 | .00 | 14,011.22 |

Transaction Receipt / Funds Availability Notice

CKG: DEPOSIT       12/13/11 10:16    FC#00966 FA# 002
016-01 Acct# xxxxxxx960              $14,011.22 ONL

$14,011.22      Available Today

Thank you for banking with Citibank.                     citibank

| | | | | |
|---|---|---|---|---|
| Check No.: 99381   Check Date: Dec 09, 2011   Currency: USD | | Totals: | 14,011.22 | .00   14,011.22 |

THIS DOCUMENT HAS A COLORED BACKGROUND AND A WATERMARK ON THE BACK

**R.B. SANDRINI FARMS**
(661) 725-2281
10889 CASEY AVE.
DELANO, CA 93215-9316

CITIZENS BUSINESS BANK
1613 INYO ST.
DELANO, CA 93215

90-3414
1222

099381

WARNING
DO NOT CASH THIS CHECK UNLESS YOU CAN SEE
THE WATERMARK ON THE BACK, HOLD AT AN
ANGLE TOWARDS OR AWAY FROM A LIGHT, OR
MARK WITH THE EDGE OF A COIN TO VERIFY.

Pay Fourteen Thousand Eleven Dollars and 22 Cents USD

| | DATE | CHECK NO. | CHECK AMOUNT |
|---|---|---|---|
| | Dec 09, 2011 | 99381 | 14,011.22 |

PAY
TO
THE
ORDER
OF

INTERNATIONAL FRUIT GENETICS
441 VINELAND ROAD
BAKERSFIELD CA 93307

R.B. SANDRINI FARMS

⑈099381⑈ ⑆122234149⑆ 053100090⑈

WARNING - DO NOT CASH WITHOUT NOTING THE WATERMARK ON REVERSE WHICH CAN BE SEEN AT AN ANGLE

# EXHIBIT H

005899

Pay Fifteen Thousand Three Hundred Ninety-Eight Dollars and 81 Cents USD

11/28/2012          5899          15,398.81

INTERNATIONAL FRUIT GENETICS
441 VINELAND ROAD
BAKERSFIELD CA 93215

⑈005899⑈ ⑆122234149⑆ 023002132⑈

Transaction Receipt / Funds Availability Notice

CKG: DEPOSIT          12/04/12 14:52    FC#00966 FA# 010
060-01 Acct# xxxxxxx960                 $15,398.81 ONL

$15,398.81      Available Today

Thank you for banking with Citibank.      citibank

⑈5ﬀﬀ⑈ﬀ20c8⑈ 4664060960⑈      28

R B SANDRINI FARMS
10889 CASEY AVE.
DELANO, CA  93215
PHONE: 661-725-2281
FAX: 661-725-2287

---

INTERNATIONAL FRUIT GENETICS
441 VINELAND ROAD
BAKERSFIELD, CA  93307

NOVEMBER 28, 2012

TOTAL 2012 CROP PRODUCTION FOR NICOLO

18,848 BOXES @ $16.34 (average price)     $307,976.32
ROYALTY                                          X 5%

TOTAL ROYALTY DUE                          $15,398.81

**R B SANDRINI INC**

Vendor:  INTERNATIONAL FRUIT GENETICS          ID: 449

| Invoice No. | Invoice Date | Description | P.O. No. | Voucher Amt | Discount Amt | Pay Amount |
|---|---|---|---|---|---|---|
| | 11/28/2012 | 2012 ROYALTY - NICOLO | | 15,398.81 | .00 | 15,398.81 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Check No.: 5899 | Check Date: 11/28/2012 | Currency: USD | Totals: | 15,398.81 | .00 | 15,398.81 |

# EXHIBIT I

**R B SANDRINI INC**

Vendor: INTERNATIONAL FRUIT GENETICS

| Invoice No. | Invoice Date | Description | P.O. No. | Voucher Amt | Discount Amt | Pay Amount |
|---|---|---|---|---|---|---|
| | 12 16, 2013 | | | 16,601.34 | .00 | 16,601.34 |

Check No.: 6080     Check Date: 12 16, 2013     Currency: USD          Totals:     16,601.34          .00     16,601.34



CITIZENS BUSINESS BANK
1513 Inyo St.
Delano, CA 93215
90-3414-1222

10689 CASEY AVE.
DELANO, CA 93215-9316
(561) 725-2281

006080

Pay Sixteen Thousand Six Hundred One Dollars and 34 Cents USD

|  | DATE | CHECK NO. | CHECK AMOUNT |
|---|---|---|---|
|  | 12 16, 2013 | 6080 | 16,601.34 |

INTERNATIONAL FRUIT GENETICS
441 VINELAND ROAD
BAKERSFIELD CA 93215

⑈006080⑈ ⑆122234149⑆ 023002132⑈

Transaction Receipt / Funds Availability Notice

CKG: DEPOSIT          12/23/13 12:27     FC#00966 FA# 005
096-02 Acct# xxxxxxx960                  $16,601.34 ONL PIC

172/966
1222

$16,601.34     Available Today

Thank you for banking with Citibank.     citibank

R B SANDRINI FARMS
10889 CASEY AVE
DELANO, CA  93215
PHONE:661-725-2281
FAX: 661-725-2287

INTERNATIONAL FRUIT GENETICS
441 VENELAND ROAD
BAKERSFIELD, CA  93307

DECEMBER 16, 2013

TOTAL 2013 CROP PRODUCTION FOR NICOLO

20,184 BOXES @ $16.45 (average price)    $332,026.80
                      ROYALTY                     X 5%
                                         _____
                                          $16,601.34

1